The People of the State of New York ex rel. Doctors Hospital, Inc., Appellant, against James J. Sexton et al., Formerly Constituting the Board of Taxes and Assessments of the City of New York, et al., Respondents.

First Department, May 12, 1944.

*John Godfrey Saxe* of counsel (*E. W. Debevoise* and *Edward D. Burns* with him on the brief; *Debevoise, Stevenson, Plimpton & Page,* attorneys), for appellant.

*Arthur H. Goldberg* of counsel (*Oscar L. Tucker* and *Edmund B. Hennefeld* with him on the brief; *Ignatius M. Wilkinson, Corporation Counsel*), for respondents.

COHN, J. The question presented is whether under the provisions of the Tax Law relator, Doctors Hospital, Inc., is entitled to have exempted from taxation its real property in the city of New York.

Relator was organized pursuant to the Membership Corporations Law in April, 1927, with the approval of the State Board of Charities, to establish and operate a hospital. Under the leadership of a committee of eminent doctors and laymen who believed that there was a definite need for a modern, well-equipped hospital affording first class accommodations, the hospital, which is known as Doctors Hospital, was planned.

The original purpose of its sponsors was to make a profit for those who participated. To effectuate the profit-making plan, a real estate company known as 87th Street and East End Avenue Corporation (hereinafter referred to as the owning company) was organized. There was sold over $1,600,000 of stock in the owning company entitling its holders to dividends. The owning company procured the necessary land, erected and equipped the hospital buildings. The structures were designed exclusively for hospital purposes and were equipped with the most modern facilities to provide for the care of the sick. Funds for the enterprise came from the sale of stock of the owning company, a first mortgage building loan of $2,000,000 and cash loans.

The hospital opened early in the spring of 1930. Relator had entered into a lease with the owning company wherein it agreed to pay taxes, maintenance charges and a net rental of $245,000 to cover annual charges and dividends to be paid to the stockholders of the owning company. For the year 1931 the lease was renewed on the same terms, but for the year 1932 the rental was reduced to $150,000.

From the very beginning, the hospital was in financial difficulties. Large losses were sustained in 1930 and in 1931, and it became obvious that the enterprise could not continue under the original scheme.

A plan of reorganization was then evolved. Accordingly, on August 1, 1932, the owning company, with the consent of its stockholders, transferred the hospital property and its other assets to relator, which in turn assumed all the outstanding obligations of the owning company. The stockholders of the owning company surrendered their entire investment, numerous creditors reduced the amount of their obligations and in some instances abandoned their claims and the holder of the mortgage reduced the interest rate from 5½% to 2%.

Since August 1, 1932, the hospital has been conducted by relator solely as a hospital without any pecuniary profit to any one connected therewith. It is now staffed by a medical board of two hundred physicians; it has a bed capacity of 275; and during the six years from 1933 to 1938 it treated 18,428 patients who spent a total of 242,978 patient days in the hospital. Free service to those who could not afford to pay was inaugurated in August, 1935, for a limited number of patients, though the proof shows that free care cost the relator over $57,000 in the year 1938.

In September, 1932, relator duly applied to respondents, Commissioners of Taxes and Assessments of the City of New York, for tax exemption of the hospital buildings and the land upon which these were erected. Similar applications were made in each of the tax years following, embracing in all the period from January 1, 1933, to July 1, 1939. The petitions were denied and upon review by writs of certiorari the determinations of respondents were confirmed by the Special Term.

The claim for tax immunity is based upon section 3 and section 4, subdivision 6 (formerly subd. 7) of the Tax Law (derived from L. 1896, ch. 908), the pertinent provisions of which are as follows:

" § 3. Property liable to taxation

All real property within this state is taxable unless exempt from taxation by law.   *   *   *

" § 4. Exemption from taxation

The following property shall be exempt from taxation:   *   *   *

6. *The real property of a corporation* or association *organized exclusively for* the moral or mental improvement of men and women, or for religious, bible, tract, charitable, benevolent, missionary, *hospital,* infirmary, educational, public playground, scientific, literary, bar association, library, patriotic, historical or cemetery *purposes,* or for the enforcement of laws relating to children or animals, *or for two or more such purposes, and*

*used exclusively for carrying out thereupon one .or more of such purposes.* But no such corporation or association shall be entitled to any such exemption if any officer, member or employee thereof shall receive or may be lawfully entitled to receive any pecuniary profit from the operations thereof, except reasonable compensation for services in effecting one· or more of such purposes, or as proper beneficiaries of its strictly charitable purposes; or if the organization thereof for any such avowed purposes be a guise or pretense for directly or indirectly making any other pecuniary profit for such corporation or association, or for any of its members or employees, or if it be not in good faith organized or conducted exclusively for one or more of such purposes." ·(Emphasis ours.)

In resisting the claim for tax exemption respondents asserted that relator's buildings have not been used for hospital, charitable or other exempt purposes within the meaning of the Tax Law since there was a failure to extend adequate free-care service to the public. The contention of respondents was sustained by the Special Term. The court held that Doctors Hospital had failed to do any genuine charitable work for the public and accordingly had not brought itself within the tax exemption statute; that the Legislature in enacting the Tax Law of 1896 must have intended that the word " hospital " as used in the Tax Law would embrace only those hospitals which rendered medical aid without charge to the needy as provided in section 4 of chapter 95 of the Laws of 1889, and that the amount of the charitable work done by relator was not a *quid pro quo* for the amount of taxes to be exempted. The court further held that the attempt by relator to give public charity to specified individuals as patients of selected doctors was not done in good faith but merely for the purpose of obtaining tax immunity under the Tax Law without rendering real public charity.

Though respondents do not deny that relator was organized and maintained as a hospital during the years in question, they contend that free service to the poor must be shown before it is entitled to statutory exemption. The statute makes no such requirement. The term " hospital " in the law quoted is employed therein without any limitation whatever. If it were the intention of the Legislature to require hospitals to furnish free service to the needy as a condition precedent to tax exemption, appropriate language to that effect could readily have been employed. " We are not privileged, by judicial construction, to legislate. If a change in the wording of the provision is desired, it must be .made by the Legislature." (*Matter of Metropolitan Life Ins. Co.* v. *Boland,* 281 N. Y. 357, 361.)

Moreover, the legal meaning of charitable purposes is not necessarily limited to free service to the poor. (*Matter of MacDowell,* 217 N. Y. 454, 463; *Y. M. C. A. of City of New York* v. *City of New York,* 159 Misc. 539, affd. 251 App. Div. 821, affd. 276 N. Y. 619; *Matter of New York University* v. *Taylor,* 251 App. Div. 444, affd. 276 N. Y. 620.)

Hospitals which are devoted to the care of the sick and injured, which aid in maintaining public health and which make valuable contributions to the advancement of medical science are rightly regarded as benevolent and charitable. A hospital association not conducted for profit which devotes all of its funds exclusively to the maintenance of the institution is a public charity and this is so irrespective of whether patients are required to pay for the services rendered. (*Butterworth* v. *Keeler,* 219 N. Y. 446, 449; *Matter of Mendelsohn,* 262 App. Div. 605, 610; *Jewish Mental Health Soc.* v. *Vil. of Hastings-on-Hudson,* 255 App. Div. 77, affd. 279 N. Y. 764.) The public policy for tax exemption of the property of institutions carrying on religious, educational, scientific, hospital, charitable and kindred purposes as expressed in the Tax Law has been consistently upheld by the courts of this State. (*Matter of Huntington,* 168 N. Y. 399; *People ex rel. Bleakley* v. *Sexton,* 265 N. Y. 480; *People ex rel. Y. M. C. A.* v. *Miller,* 278 N. Y. 651; *People ex rel. Christodora House* v. *Miller,* 278 N. Y. 652; *Amherst College* v. *Ritch,* 151 N. Y. 282, 334.)

Respondents argue that the term " hospital " as employed in the Tax Law (§ 4, subd. 6) encompasses the sense and the language of section 4 of chapter 95 of the Laws of 1889. By that section there was granted tax exemption to the property of a hospital corporation organized thereunder " provided that it shall and do actually render medical and surgical aid, advice and treatment to poor persons in need of such treatment without charge therefor ". In 1895 the Legislature repealed all of chapter 95 of the Laws of 1889 save section 4 thereof. (See L. 1895, ch. 559.) Pursuant to a report of the Board of Statutory Consolidation of 1907 to the effect that the part of the Act not repealed was embraced in or repugnant to section 4 of chapter 908 of the Laws of 1896, the Legislature repealed section 4 of chapter 95 of the Laws of 1889. (See L. 1909, ch. 62.) Thus, when relator was organized in the year 1927 no portion of chapter 95 of the Laws of 1889 was to be found upon our statute books.

Nevertheless it is contended that it was the legislative purpose in enacting the Tax Law to preserve the substance of

theretofore existing statutes and to restrict rather than to enlarge the categories of tax exemption; that the failure on the part of the Legislature to specifically repeal section 4 of chapter 95 of the Laws of 1889 when it adopted the Tax Law in 1896 was indicative of an intent to include within what is now subdivision 6 of section 4 of the Tax Law the language heretofore quoted of section 4 of chapter 95 of the Laws of 1889.

Our examination of the authorities leads us to a contrary conclusion. Commissioners of Statutory Revision appointed in 1889 (L. 1889, ch. 289) to recommend revision of various statutes reported a new tax law to the Legislature of 1896. In order to eliminate the mass of special legislation upon the subject of exemptions, and to establish a uniform system, our lawmakers accepted the recommendation of the Revision Commissioners and enacted the Tax Law. (*People ex rel. Catholic Union* v. *Sayles,* 32 App. Div. 203, 205, affd. on opinion below 157 N. Y. 679.) Prior to 1896 there had been no general revision of the tax laws for many years.

The Court of Appeals has repeatedly held that the Tax Law of 1896 is a codifying act designed to reduce all statutes relating to the whole field of taxation into a complete and harmonious system and is intended to exhaust the subject to which it relates. (*Peterson* v. *Martino,* 210 N. Y. 412, 416; *Pratt Institute* v. *City of New York,* 183 N. Y. 151; *Matter of Troy Press Co.,* 187 N. Y. 279, 284; *People ex rel. Roosevelt Hospital* v. *Raymond,* 194 N. Y. 189, 197.) It overrides earlier statutes, both general and special, relating to taxation though the laws thus displaced have not been enumerated in the schedule of one hundred fifty-three acts and parts of acts expressly repealed by the Tax Law. (*Peterson* v. *Martino, supra; Matter of Huntington, supra.*) " The new enactment is substituted in the place of all statutes previously existing and becomes the sole rule of action." (*Pratt Institute* v. *City of New York, supra,* at p. 157.) The only exceptions permitted have been instances where a prior exemption statute had been passed as a direct inducement for the conveyance of property so that a holding of repeal of tax exemption by implication would have resulted in a gross breach of faith. (*People ex rel. Roosevelt Hospital* v. *Raymond, supra,* pp. 197, 200; *People ex rel. Cooper Union, etc.,* v. *Sexton,* 247 App. Div. 371, affd. 273 N. Y. 462.)

The determination of the Special Term suggests that tax exemption may be granted only upon a *quid pro quo* basis, that is, that the grant of exemption must have some relation to the amount of free charitable work rendered. If this were the

rule, the city's administrative officials would have the discretionary power of determining whether tax exemption should or should not be granted. The public policy of the State requiring tax exemption to be determined by law (Tax Law, § 3) would then be meaningless. No such power was given to respondents by the Legislature and indeed article XVI, section 1 (adopted in 1938) of the Constitution of the State of New York, is an express mandate against any rule of discretion or rule of reason that has been here suggested. It is provided therein that "Exemptions from taxation may be granted only by general laws ".

The principle that exemptions from taxation are to be strictly construed is invoked by respondents. However, where, as here, the rule of strict construction would thwart the very command of the statute, such a rule would obviously have no application. (*Assn. for Colored Orphans* v. *Mayor, etc.*, 104 N. Y. 581; *St. Barbara's R. C. Church* v. *City of New York*, 243 App. Div. 371, 373; Cooley, The Law of Taxation, 4th ed. § 674, p. 1416.) " The higher public policy of encouraging contributions for public purposes controls and supersedes the policy of strict construction." (1 Paul, Federal Estate and Gift Taxation [1942], pp. 647-648.)

Upon the evidence we find that relator was organized exclusively for hospital purposes and was used solely for such purposes during the years involved in this proceeding. Therefore, relator is, under the specific provisions of the Tax Law, entitled to exemption unless it is being operated upon a profit basis. That is the single limitation which the statute imposes. A similar standard was incorporated in the State Constitution. (Art. XVI, § 1.)

It is earnestly contended by respondents that relator was in fact being operated upon a profit basis; that there was a pecuniary benefit accruing to its officers and members after August 1, 1932; and that at the time of the reorganization and when the owning company delivered to relator its assets and relator in turn assumed all the liabilities of the owning company, the liabilities were in excess of the assets.

We are of the view that there is ample evidence to support the findings of the Special Term to the effect that the assets acquired by relator from the owning company on August 1, 1932, exceeded the liabilities assumed and that no officer, member or employee of the relator received or was or is lawfully entitled to receive any pecuniary benefit directly or indirectly from the operations of the relator except reasonable compensation for services rendered.

We find that since 1932 and during all the years involved in this proceeding, relator was organized and conducted exclusively for hospital purposes; that no pecuniary profit accrued to any of its officers, members or employees during the years in question; that it was conducted upon a non-profit basis; and that in accordance with the provisions of section 3 and section 4, subdivision 6, of the Tax Law, its real property for the period involved herein is exempt from taxation.

The order should be reversed, with twenty dollars costs and disbursements to the relator-appellant, and relator's application for exemption for the years 1933 to 1938 and the first half of 1939 inclusive, should be granted and the assessments for said years canceled of record.

MARTIN, P. J., TOWNLEY, GLENNON and CALLAHAN, JJ., concur.

Order unanimously reversed, with twenty dollars costs and disbursements to the relator-appellant, and relator's application for exemption for the years 1933 to 1938 and the first half of 1939 inclusive, granted and the assessments for said years canceled of record. Settle order on notice.