[L. A. No. 20634.   In Bank   Aug. 18, 1950.]

FREDERICKA HOME FOR THE AGED (a Corporation), Respondent, v. COUNTY OF SAN DIEGO, Appellant.

Fred N. Howser, Attorney General, E. G. Benard, Deputy Attorney General, James Don Keller, District Attorney, and Carroll H. Smith, Chief Trial Deputy District Attorney, for Appellant.

Gray, Cary, Ames & Driscoll and John M. Cranston for Respondent.

SPENCE, J.—Plaintiff, a nonprofit corporation operating a home for elderly people on a "life care contract" basis, brought this action to recover taxes paid under protest for the tax year 1946-1947. It claimed that it was a charitable organization devoting its property exclusively to charitable purposes and so entitled to the benefit of the recently adopted welfare exemption. (Cal. Const., art. XIII, § 1c; Rev. & Tax. Code, § 214.) With certain exceptions—a parcel of vacant land, some acreage leased for commercial purposes, and a small item of solvent credits—the trial court adjudicated the exemption claim in plaintiff's favor and entered judgment accordingly for a tax refund. From such judgment defendant county has appealed, contending that the record does not sustain the conclusion that plaintiff was functioning as a charitable institution within the meaning of the welfare tax exemption law. Upon the undisputed facts, we have concluded that defendant's contention cannot be sustained.

At the trial the only evidence introduced was that offered by plaintiff. It appears that plaintiff was incorporated in 1908 and received as a gift certain land in Chula Vista—some 15 acres—and the buildings then on it. Subsequent buildings were donated, and in 1916 a trust fund of $200,000 was

created. It is conceded that plaintiff is a nonprofit corporation organized for the purpose of providing a home for aged people at its site in Chula Vista, and that the property in dispute, with the exception of the portion hereinafter mentioned, is used exclusively for such purpose and is irrevocably dedicated thereto; that all of its income—whether from charges to inmates, investments, gifts or donations—is used entirely in the maintenance and operation of the home—that the members of its board of directors serve without compensation, and that the compensation paid to its employees is ''fair and reasonable.'' But regardless of these qualifying factors, defendant cites plaintiff's ''manner of operation'' as determinative of its ineligibility for the tax benefit applicable to a ''charitable institution'' within the meaning of the welfare exemption law.

Applicants for admission to the home must have attained the age of 69 years, be in good health, and meet the approval of the board of directors—including consideration over a three months' probationary period. Prior to November 1, 1944, each applicant, in addition to paying a fixed fee for maintenance at the home, was required to execute a trust agreement whereby three-fifths of the applicant's estate would go to the home upon death of the applicant. A new policy was adopted after said date eliminating the trust agreement as an entry requirement, and at the same time the minimum fee for admission to the home was fixed at $5,500. By the terms of the life care contract made with the applicant, the home agreed to furnish room, board, and other services.

As documentary evidence in its behalf and representing the ''last figures available at the time [the exemption] claim was filed'' (Code Civ. Proc., § 1963, subds. 28, 32), plaintiff introduced a financial report for the fiscal year ending June 30, 1945. According to that accounting record, 21 new residents were admitted during the period covered, 16 of them under the policy of charging a minimum fee of $5,500 as established in November, 1944, the average fee being $6,264.04. The exact amount of the admission fee of each applicant was computed actuarily and also depended on the applicant's choice of accommodations. According to one of plaintiff's directors, the division as to the source of plaintiff's income was fixed at 35 per cent from interest on the endowment fund and donations and 65 per cent from admission fees. Certain other schedules introduced in evidence clearly showed that over 25 per cent of plaintiff's gross cash income, as well as its

land and buildings, came from sources other than the residents of the home. The trial court found that the total amounts received by plaintiff from its inmates and from the endowment fund have always been insufficient to pay operating expenses of the home, and that the deficit has been met through voluntary gifts and contributions from persons not inmates of the home. The same director, a certified public accountant who prepared all of plaintiff's tax reports, also testified that plaintiff had been exempted from payment of all federal social security and income taxes, as well as from state unemployment insurance taxes, and a finding was so made. The court further found that the recited facts attesting to plaintiff's method of operation prevailed during the taxable year in question, 1946-1947, and ''were true when plaintiff's claim for exemption was filed and [denied] by the county officials.'' Such finding was in accord with the testimony of plaintiff's director attesting to the continued level of service and ''policy'' of operation maintained at the home ''from the inception of the institution as I know it'' to ''the present [time]'' (date of trial, January, 1948).

As discussed in the opinion filed by this court in certain consolidated hospital cases (*Cedars of Lebanon Hospital* v. *County of Los Angeles*, L. A. No. 20610, *ante*, p. 729 [221 P.2d 31]), the problem of determining whether or not plaintiff is entitled as a charitable organization to the welfare tax exemption must be resolved upon the basis of a ''strict but reasonable construction'' of the exempting language, and the claimant of such benefit has the burden of showing that it clearly comes within the terms thereof. It is not sufficient that the institution shall have originated through a charitable gift or bequest, but *''it must actually dispense charity''* if it is to satisfy the requirement that its property be ''used exclusively for . . . charitable purposes.'' (51 Am. Jur. § 601, p. 584; emphasis added.) However, due regard must be had for the ordinary acceptation of the exempting language and its purport in effecting the object of the lawmakers. In the light of such guiding principles, the particular facts establishing plaintiff's method of operation and function in the community must be considered.

The concept of charity is not confined to the relief of the needy and destitute, for ''aged people require care and attention apart from financial assistance, and the supply of this care and attention is as much a charitable and benevolent purpose as the relief of their financial wants.'' (*Estate of*

*Henderson,* 17 Cal.2d 853, 857 [112 P.2d 605].) So the charge of fees by such an institution as a home for the aged will not necessarily prevent its classification as charitable if such sums "go to pay the expenses of operation and not to the profit of the founders or shareholders," for all persons may "under certain conditions be proper objects of charity." (*Scripps Memorial Hospital, Inc.* v. *California Emp. Com.,* 24 Cal.2d 669, 675 [151 P.2d 109, 155 A.L.R. 360] ; see, also, 51 Am.Jur. § 602, p. 585; anno. 34 A.L.R. 634, 637; 62 A.L.R. 328, 330; 108 A.L.R. 284, 286.) In short, as the word "charity" is commonly understood in modern usage, it does not refer only to aid to the poor and destitute and exclude all humanitarian activities, though rendered at cost or less, which are maintained to care for the physical and mental well-being of the recipients, and which make it less likely that such recipients will become burdens on society.

Defendant's challenge of plaintiff's denomination as a charitable institution and the use of its property for charitable purposes stems primarily from the fact that plaintiff does not extend free services to the poor, but the welfare exemption law as above quoted makes no such requirement as a qualifying factor for the tax exemption, and if such condition were intended, appropriate language to that effect could readily have been adopted. Rather, the welfare exemption law as here involved appears to rest on a concept of charity in its ordinary sense. Consistent with such interpretation, the controlling consideration in determining whether an institution such as plaintiff should be classified as a charitable one is not whether a few or all of the recipients of its benefits may make reasonable contributions toward defraying the cost of such benefits, but whether such contributions as are made do not exceed what is required for the maintenance of the institution at a reasonable standard and are devoted to the purposes for which the institution was founded, which purposes, in the absence of the required contributions, would clearly be deemed to be charitable. If such is the situation, then the institution is no less a charity because of the receipt of such contributions, and within such concept plaintiff properly claims a tax-exempt status under the welfare exemption law.

The record contains abundant evidence that approximately 35 per cent of plaintiff's income came from interest on the endowment fund and from donations, while only about 65 per cent came from fees of the inmates. Moreover, it appears

from the testimony of one of the directors of the home, as above mentioned, that the rates were set so that the amounts received from the inmates "together with income from the endowment and from other sources" would equal expenses. In such state of the record, defendant unavailingly attacks the trial court's finding to the effect that the inmates of the home do not pay the full cost of their support and maintenance, and that in fixing the rates to be charged "the directors . . . do not endeavor to [make] a profit or even to meet all operating expenses, but rather endeavor to set rates as low as possible without creating a deficit so large that [it] cannot [be met] by gifts and contributions which can reasonably be expected."

While it is true that each applicant for admission to the home is required to pay an entry fee in return for his care, it is also true that plaintiff contributes a substantial proportion of the annual cash expenditures, as well as the use of its properties for such care. Under these circumstances, the mere payment of such fees by the inmates does not militate against plaintiff's status as a charitable organization. Nor does it matter that plaintiff requires the applicant to the home to submit to a three-month probationary period and meet the approval of the board of directors rather than permit the home to be open to the admission of any individual upon demand. Such stipulation only suggests an attempt to maintain the home in a manner which would engender harmony of association among the elderly inmates rather than endanger their peaceful, congenial living conditions through the introduction of discordant elements.

As was pertinently said in *Estate of Henderson, supra,* 17 Cal.2d 853, at page 857: "Since the enactment of the Statute of Charitable Uses during the reign of Elizabeth, aid to the aged and infirm has been recognized as charitable." Here the record shows that plaintiff is ministering to its elderly residents at a charge which, although appreciable, is within the reach of persons in modest circumstances and is no greater than that which is required to augment the substantial amount which plaintiff is able to contribute to the accomplishment of its purposes. There can be no doubt that arrangements for such life care contracts fill a social purpose as well as a need of the applicants for admission. Approaching those years when the physical and mental faculties normally decline over an indefinite period of time and being faced with the prospect of expending increased but indeterminable amounts for care

during that period, the applicants, by means of such life care contracts, avoid the need of living in penury occasioned by the haunting fear that they will exhaust their meagre resources and become public charges. ██ Accordingly, it is our conclusion that where, as here, the payments made by the elderly residents are within the reach of persons of limited means, where such payments are not commensurate with the benefits derived, where there is no element of private gain, and where all the income of the institution—including that received from residents and the substantial portion received from gifts and other sources—is devoted exclusively to affording a reasonable standard of care to such elderly persons for the balance of their lives, the concept of ·charity in its ordinary sense, as well as under a strict but reasonable construction of the welfare exemption law, is met. Such determination of plaintiff's status as a charitable institution is in accord with the general trend of authority in cases determining the character of institutions for tax exemption as well as for other purposes. (51 Am.Jur. § 602, p. 585; *Estate of Henderson, supra,* 17 Cal.2d 853, 857-858; *Scripps Memorial Hospital, Inc.* v. *California Emp. Com., supra,* 24 Cal.2d 669, 675; also, *Bishop and Charter of Cathedral of St. John the Evangelist* v. *Treasurer of City and County of Denver,* 37 Colo. 378 [86 P. 1021, 1024-1025]; *Old Colony Trust Co.* v. *O. M. Fisher Home, Inc.,* 301 Mass. 1 [16 N.E.2d 10, 11]; *Gundry* v. *R. B. Smith Memorial Hospital Ass'n.,* 293 Mich. 36 [291 N.W. 213, 214-215]; *Salvation Army* v. *Hoehn,* 354 Mo. 107 [188 S.W.2d 826, 829-831]; *In re Vassar's Estate,* 127 N.Y. 1 [27 N.E. 394, 397-398]; *In re Mendelsohn,* 262 App.Div. 605 [31 N.Y.S.2d 435, 440-441]; *People ex rel. Doctors Hospital, Inc.* v. *Sexton,* 267 App.Div. 736 [48 N.Y.S.2d 201, 205]; *Baylor University* v. *Boyd* (Tex.Civ.App.) 18 S.W.2d 700, 701; *Brattleboro Retreat* v. *Town of Brattleboro,* 106 Vt. 228 [173 A. 209, 212-213].)

██ Such adjudication of plaintiff's status in relation to the welfare tax exemption likewise comprehends that portion of its property used to house its personnel as that issue is here presented. Thus, there is considerable testimony in the record showing that those of the personnel living on plaintiff's premises do so as a matter of institutional necessity. In this regard it must be remembered that a prerequisite for entrance to the home as a resident is the 69-year age qualification, indicating the need of adequate personnel to care for such elderly

persons on the basis of 24-hour service. All of this testimony as to the institutional necessity of plaintiff's furnishing of housing accommodation for certain personnel stands uncontradicted in the record. Similar considerations were discussed in certain opinions filed with regard to the tax-exempt status of a nurses' home and the housing of other alleged essential personnel as a necessary adjunct to a hospital (*Cedars of Lebanon Hospital* v. *County of Los Angeles*, L. A. No. 20610, *ante*, p. 729 [221 P.2d 31]) and the lodging of priests and lay brothers in effectuating the operation of a religious retreat house (*Serra Retreat* v. *County of Los Angeles*, L. A. No. 20612, *ante*, p. 755 [221 P.2d 59]), to which opinions reference is hereby made in support of this phase of plaintiff's welfare tax exemption claim.

It therefore follows that the trial court correctly determined that plaintiff is a charitable institution and entitled to exemption from taxation on all the property in dispute.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.