173 So.2d 176 (1965)
Mac S. HAINES, etc., et al., Appellants,
v.
ST. PETERSBURG METHODIST HOME, INC., Appellees.
No. 4154.
District Court of Appeal of Florida. Second District.
February 19, 1965.
Rehearing Denied April 5, 1965.
*177 Page S. Jackson and Julian R. Howay, Clearwater, for appellants.
Baynard, McLeod & Overton and William W. Gay, St. Petersburg, for appellee.
WHITE, Acting Chief Judge.
It is urged on this appeal that, contrary to the import of the chancellor's decree, Florida law[1] does not afford property tax exemption to private retirement hotels, old age homes or nursing and convalescent homes where such establishments, though chartered as non profit, do not cater generally to the public or to the indigent but to selected persons who become tenants or residents by purchasing foundation memberships and obligating themselves to make *178 future periodic payments similar to rent or board and keep. This, according to the appellant officials, is essentially the non-exempt status of the plaintiff corporation which the chancellor nevertheless held legally entitled to exemption because of what he found to be its charitable nature.
The plaintiff's corporate name and purpose, its policies and practices, and the origins and extent of its financial resources pose a number of questions to be resolved in reaching a conclusion on the merits of this important case. What, for example, is the significance of the plaintiff's sectarian label and the humanitarian complexion of its enterprise? What is the effect of service without charge to an occasional resident who might become unable to meet his recurring contractual obligations; and what is the legal import, if any, of the financial resources of the residents at the time they become tenants in plaintiff's establishment?
The defendants, Pinellas County Tax Assessor, Pinellas County Tax Collector and the State Comptroller, appeal a summary final decree declaring real and personal property of plaintiff St. Petersburg Methodist Home, Inc., exempt from taxation and ordering a refund of 1962 taxes paid under protest. The record reflects that the plaintiff was chartered as a non-profit corporation in 1953 and its purpose was to establish, maintain and operate a home for retired and elderly persons. This worthy purpose was accomplished and the home, known as Sunny Shores Villas, St. Petersburg Methodist Home, now provides lodging, board and incidental nursing care for 212 residents.
Applicants for admission are required by regulation to meet certain standards prescribed by plaintiff's board of directors before the admissions committee will recommend acceptance. A successful applicant must pay a founder's fee ranging from $5,000 to $7,000 and enter into a "life care contract" obligating himself to pay $150 a month for the balance of his natural life. This is the basic plan, although the board of directors recently accepted an applicant at a reduced founder's fee of $3,000 and a reduced rate of $100 a month, and several residents who became unable to meet their contractual monthly payments have been kept at reduced charges.
The record indicates that one resident of the home now pays nothing on a monthly basis; one pays $50 a month; one pays $75 a month; 20 pay $100 a month; 56 pay $125 a month; 95 pay $140 a month, and 38 pay $150 a month. The average cost of operating a room is reportedly $135 a month. Thus 133 residents pay more than their monthly pro rata share of the cost of operation while 79 residents pay less. When a resident dies the vacancy is filled by accepting a new resident who in turn pays his founder's fee and enters into a life care contract. From the inception of the establishment in 1953 through 1962, there was a mortality of 66 residents. The deaths for that period averaged 7.33 a year, but for the last two years thereof the annual average was 14 deaths.
The plaintiff began its operation with assets valued at $764,000 and liabilities of $714,000, or a net worth of $50,000. During the stated period of operation the cumulative receipts, mostly from founder's fees but not including the regular monthly charges, totaled $1,809,700. The value of assets owned by the plaintiff, as reflected by the record, is $1,587,800  a capital gain of $823,800. The initial indebtedness has been completely liquidated and there are now no fixed liabilities. The assets value of $1,587,800 is $211,900 less than the total capital receipts of $1,809,700. An affidavit of plaintiff's accountant indicates that this figure of $221,900 represents the amount necessary to absorb the deficit resulting from the cost of operation exceeding the aggregate monthly charges paid by the residents over the reported nine and a fraction years of operation. Included in this figure are "operating deficits"[2] *179 of $143,400 together with an amount described as "interest and other costs."
In February of 1956 the plaintiff was held by the Internal Revenue Service to be exempt from federal income taxes under Section 501(c) (3) of the Internal Revenue Code. The plaintiff has been ruled exempt from the Florida Sales and Use Tax Law and the Florida Unemployment Compensation Tax Law. From the beginning of its operation until 1962 the plaintiff was not subjected to ad valorem taxation. Taxes for 1962 were assessed against the property and, upon denial of exemption by the County Board of Tax Equalization, were paid under protest and placed in an escrow account.
The plaintiff alleged in its complaint that its property was used exclusively for the operation of a home for retired persons; that the Tax Assessor assessed it for ad valorem taxes for 1962 and that the Board of County Commissioners, sitting as the Board of Tax Equalization, denied exemption on the ground that plaintiff's purposes and functions were not charitable; that plaintiff thereupon paid the taxes under protest. The complaint prayed for a decree declaring plaintiff's property exempt from ad valorem taxes and enjoining the assessment and collection of such taxes.
The defendants' answer denied that the plaintiff was a charitable institution within the meaning of the statute and accordingly denied that plaintiff's property was entitled to tax exemption. The plaintiff's motion for summary decree was heard on the complaint, answer, affidavits, and motion for summary decree filed on behalf of the defendants, whereupon the chancellor entered summary final decree for the plaintiff, finding inter alia that:
"This case is controlled by the principles set forth in the decisions of the Supreme Court of Florida in Miami Battlecreek v. Lummus [140 Fla. 718], 192 So. 211, and Hungerford Convalescent Hospital v. Osborn, 150 So.2d 230. These cases interpret and construe Section 1, Article 9 of the Florida Constitution and Section 192.06 (3) Florida Statutes, which exempt charitable institutions from taxation.
"That no factual situation identical with the instant case has been presented to the Florida Appellate Courts for decision but this court finds the cases of Fredericka Home v. San Diego County [35 Cal.2d 789], 221 Pac.2d 68, and Fifield Manor v. County of Los Angeles [188 Cal. App.2d 1], 10 Cal. Reporter 242, decided under exemption statutes worded similar to the Florida Statute and Constitution to be of material help in interpreting the law of Florida in the instant case as to the charitable nature of the plaintiff institution."
Exemptions from taxation are in the nature of special favors, and tax exemption statutes are generally subject to the rule of strict construction. Coppock v. Blount, Fla.App. 1962, 145 So.2d 279; State ex rel. Miller v. Doss, 1941, 146 Fla. 752, 2 So.2d 303; Miami Battlecreek v. Lummus, 1939, 140 Fla. 718, 192 So. 211; Lummus v. Florida-Adirondack School, 1936, 123 Fla. 810, 168 So. 232; 15 A.L.R.2d 1065, 34 A.L.R. 635. In cases of doubt applications for exemption are to be resolved against the applicants and in favor of the taxing power; and exemptions are allowable only when and to the extent that they serve the general welfare. Overstreet v. Tubin, 1951, 53 So.2d 913; Lummus v. Cushman, 1949, 41 So.2d 895; Steuart v. *180 State ex rel. Dolcimascolo, 1935, 119 Fla. 117, 161 So. 378.
We take it that tax exemption of the property of a non-profit private corporation on the ground of charitable purpose and use cannot be granted under Florida Law, as hereafter outlined, absent demonstration that the applicant is committed to a purpose which is charitable, in a true definitive sense, and that the property is being used for such purpose. The character of the ownership, the wording of the applicant's charter, the charitable sound of its name, the granting of gratuities that are merely incidental or supervenient to the principal operation, the furnishing of services which might be beneficial in the future  these of themselves cannot justify exemption. See e.g. Lummus v. Florida-Adirondack School, Inc., 1936, 123 Fla. 810, 168 So. 232; University Club v. Lanier, 1935, 119 Fla. 146, 161 So. 78; Johnson v. Sparkman, 1947, 159 Fla. 276, 31 So.2d 863, 172 A.L.R. 1067. See also Clements v. Ljungdahl, 1946, 161 Kan. 274, 167 P.2d 603, 605. Accordingly it would appear in the present case that exemption cannot be justified if grounded only on the future possibility that plaintiff's operational gains might be used to provide some measure of free accommodation for residents who might become unable to pay in full.[3]
Section 1 of Article IX of the Florida Constitution, F.S.A., relating to uniform and equal rate of taxation and just valuation of property, excepting property exempted by law, is mentioned in the appealed decree but requires no discussion in this opinion. The section of the Florida Constitution especially relevant to this case, with our emphasis on the pertinent portions, is Section 16 of Article XVI which provides that "[t]he property of all corporations * * * shall be subject to taxation unless such property be held and used exclusively for religious, scientific, municipal, educational, literary or charitable purposes." The exemption provision is implemented by Fla. Stat. Sec. 192.06(3) cited supra in footnote 1.
There has been a conspicuous increase of corporate projects of a charitable or quasi charitable nature. The fact situations in this field have multiplied in variety and complexity as well as number. Therefore cases cited as interpretive of exemption law must be carefully construed with such limitations as are required by reference to the facts. We come to a discussion of cases after noting the pragmatic importance[4] of the immediate problem  whether the public interest is advanced or retarded by the granting of tax exemptions such as here in question  and determining whether after all it is a matter of legal *181 consequence that the public interest may be affected one way or the other by such exemptions. In resolving this peculiarly involved question and other aspects of the case, we have sought to follow the highest judicial interpretations of the organic and statutory law of Florida insofar as such interpretations can be ascertained and rationally related to the instant facts.
The plaintiff's claim for exemption is premised on law designed to promote a constructive public policy,[5] so the very nature of the case dictates that the public interest be considered conjunctively with plaintiff's charter, its plan of operation, the extent to which its tenants are paying residents, the question of whether or not it is substantially self-sustaining, and also whether the granting of such exemption would give it undue preference over private operations which compete for tenants from the same class or pool of people who apparently are able to purchase their retirement. From a resolution of these interrelated matters we determine whether the plaintiff fulfills the legal concept of a charitable institution entitled to exemption from ad valorem taxation, and upon consideration we conclude that the plaintiff does not qualify in that respect.
"Charity" is sometimes used interchangeably with "benevolence" or "beneficence" in describing good-will, or a helpful attitude or kindly acts, but "charity" is commonly understood more objectively as denoting gifts to the poor or positive steps taken to relieve distress and suffering of those unable to help themselves. It is the latter concept, and not the former, that is consistent with the constitutional and statutory terminology relative to the present case. In context with "charitable" the word "benevolent" is used in the statute, though not in the Constitution, and it has been observed that although every charitable purpose is benevolent the converse is not always true. See e.g. Adye v. Smith, 44 Conn. 60, 26 Am.Rep. 424; Smith v. Pond, 90 N.J. Eq. 445, 107 A. 800; 5 Words and Phrases p. 360. In the case here, in view of the facts and the ground on which the exemption is sought, we ascribe to the word "benevolent" the same meaning as "charitable" used in its objective sense[6] of providing relief to those unable to help themselves.
In 84 C.J.S. Taxation § 282 at page 544, the text comments on the meaning of "charitable institution" as used in tax exemption statutes:
"* * * As used in such statutes, it has been defined as an organization or institution engaged in the free assistance of the poor, incapacitated, distressed, etc.; and under this definition the characteristics of an organized charity are that whatever it does for others it does free of charge, or, at least, so nearly free of charge as to make the charges nominal or negligible, and that those to whom it renders help or services are those who are unable to provide themselves with what the institution *182 provides for them, that is, they are legitimate subjects of charity.

"The exemption of a charity does not aid in showing what a charity is, but whatever in the law is regarded as a charity public in nature is relieved from taxation if it takes institutional form. Statutes exempting real property belonging to, or held for the benefit of, charitable institutions under certain conditions have been held to have reference to a charity in fact as distinguished from one in theory. It is of the essence of a privately organized public charity, termed in the law as a charitable trust, that it hold property in trust for the public benefit, in order to be exempt from taxation." (Emphasis added.)
Under the heading "Private Not-for Profit Organizations," in The Practical Lawyer, Vol. 9, No. 7, pages 55, 73, November 1963, there appears the following comment on the use factor in claims for exemption on charitable grounds:
"Exemptions from property taxes, either those on land or personal property, will be found in the constitutions or the statutes of the various states. In general, the exemptions from taxation of real property are dependent not only upon ownership but also upon use. While the phraseology varies, the idea is, in general, that such property should be used for religious worship, for schools and colleges, for purposes purely charitable, etc., or the exemption may be granted to the institution as such. See 84 C.J.S. Taxation § 282 (1954).
"The point to remember is that the private not-for-profit organization is, by definition, not engaged in any of these activities. This would seem to be so even though a trade association, for example, has some educational purposes, such as the exchange of statistical trade information. To generalize, the private not-for-profit organization of the usual type would not normally be exempt from the property taxes upon real or personal property of a particular state. * * *" (Emphasis supplied.)
We come now to a comparison of cases, including those cited in the chancellor's decree. The case of Miami Battlecreek v. Lummus, supra, is materially distinguishable. It involved a hospital which, by Article III of its charter, was required to undertake the care, treatment and relief of "both indigent persons and patrons who are able to pay * * *" and its work was to be "purely charitable, benevolent, and philanthropic * * * without profit." The special master reported that the hospital:
"* * * uses its property and facilities for the benefit of distressed people in cases of public distress such as hurricanes; that all people who apply to the plaintiff for treatment are given treatment whether they are able to pay for the same or not * * *." (Emphasis supplied.)
The court held that such a charitable institution available to the public does not "lose" its charitable character and tax exemption privilege by reason of the fact that patients who are able to pay are required to do so where the funds so derived are devoted, according to mandate of the charter, to the purely charitable purposes indicated.
There is no reported Florida case squarely parallel to this case. There are several Florida decisions which, if interpreted without due evaluation of factual differences, might seem to support the plaintiff's position. In Hungerford Convalescent Hospital Association v. Osborn, Fla. 1963, 150 So.2d 230, also cited in the chancellor's decree, the Supreme Court found that the hospital qualified for exemption. The court observed that there were no requirements for admission other than the need for services and the availability of a bed for the patient; that the hospital undertook *183 to charge each patient on the basis of ability to pay and the particular care needed; that all income from charges above expenses, were required by charter to be used for "care and treatment of persons unable to pay therefor," and that all profits were in fact used for such purpose.
The present case does not involve a hospital[7] and it also differs from the Hungerford case in that plaintiff's facilities are not available to the general public and applicants are not accepted unless they are able to pay. Moreover, even though a minority of plaintiff's residents may pay less than their estimated pro rata share of current operating expenses, this does not take into account the founder's fees paid in advance and averaging $5,500.00 per resident. The founder's fees, whether taken as capital advancement or treated as amortized over the period of the resident's life or life expectancy, remains a substantial part of the consideration paid by the resident for the service rendered by the plaintiff.
The plaintiff submits that charity may extend to the rich as well as to the poor, citing Fredericka Home for the Aged v. San Diego County, 1950, 35 Cal.2d 789, 221 P.2d 68 and Fifield Manor v. County of Los Angeles, 1961, 188 Cal. App.2d 1, 10 Cal. Rptr. 242, also cited by the chancellor. In comparison with the present case, those cases reflect differences and also some factual similarities. They apparently affirm the broader concept of charity as ground for exemption under the construction placed on the California statute, but they are not consistent with the tenor of Florida law as pronounced by our Florida courts. Moreover, even under the California statute no exemption is allowable unless by its charter the applicant has irrevocably dedicated its property to charitable uses. Section 214, California Revenue and Taxation Code. The plaintiff here would not qualify for exemption in California since its charter does not disclose what would happen to its assets in the event the corporation should be dissolved.[8]
The plaintiff points out that it has been granted state excise and federal income tax exemption. The implication that exemption should extend also to the subject property is rejected. Under the Federal Internal Revenue Code, income tax exemption does not depend so much upon how the applicant makes its money or how it uses its property as upon how it is currently spending the money it makes. See e.g. Southeastern Fair Ass'n v. United States, 1943, 52 F. Supp. 219, 100 Ct.Cl. 216; annotation 69 A.L.R.2d 871. It cannot be emphasized too strongly that a dedicated charitable use of the property, with availability to the public, is a condition to property tax immunity on this ground. A minor or incidental use for charitable purposes is not enough.[9] Johnson v. Sparkman, 1947, 159 Fla. 276, 31 So.2d 863, 172 A.L.R. 1067.
*184 In Society of Cincinnati v. Exeter, 1943, 92 N.H. 348, 31 A.2d 52, the Supreme Court of New Hampshire, confronting a similar situation, commented in part as follows:
"* * * Implied in the test [of a charitable institution under the New Hampshire statute], or as a corollary to it, the public service to be performed must be obligatory. It is of the essence of a privately organized public charity, termed in the law as a charitable trust, that it hold property in trust for the public benefit."
Oregon Methodist Homes, Inc. v. Horn, 1960, 226 Or. 298, 360 P.2d 293, is a remarkably parallel case holding that a home for the aged, organized as a non-profit corporation and operated on payments derived from the residents, was not a charitable institution within the meaning of the Oregon tax exemption statute. The residents of the home were required to pay founder's fees ranging from $4,800 to $20,000 depending upon the space the resident would be privileged to occupy. Each resident was required also to pay $100 each month for the balance of his life for a life care contract and, as in the present case, the applicants were screened. Stressing that taxation is the rule and exemption is the exception, the court observed that whether or not a non-profit corporation is a charity is to be determined by the context of its charter and the manner in which its affairs are conducted. It was noted that although the founders apparently entertained the idea that at some future time services would be extended to the indigent on a charitable basis, this was meaningless unless resolved into present reality.
Without assuming to outline all the matters to be considered in determining the issue of exemption, the Oregon Court noted in substance these points of inquiry (1) the application or use of receipts, (2) whether patrons received the same treatment irrespective of ability to pay, (3) whether the doors of the home were open to the poor as well as the rich and without other discrimination, (4) whether charges were made to all patrons and whether any charges were made to the indigent, (5) whether a charitable trust fund was created, (6) whether, if the home had no operational gains, there were offsetting advantages, and (7) what provision was made by charter or by-laws as to disposition of assets in the event of corporate dissolution.
The Oregon court differentiated its holding from two California decisions and noted that the California statute granting tax exemption to charitable organizations limits the immunity privilege to corporations meeting seven specifications. The sixth specification requires that the property belonging to the corporation claiming charitable status must be irrevocably dedicated to religious, charitable, scientific or hospital purposes and that, upon corporate liquidation, dissolution or abandonment, the property will not inure to enhancement of private interests but to a successor foundation or corporation organized and administered for charitable purposes. Finding among other things in the case before it that there was no charter provision for a continuation of charitable works, the Oregon court held that the corporation did not qualify for exemption.
In 1961 the following question was submitted to the Attorney General of Florida:
"Is a home for aged persons, owned and operated by an organized church, contracting with aged persons to supply them, for a consideration, with room, board and medical services, during the remainder of their natural lives, for that reason entitled to a tax exemption?"
*185 The responsive opinion is not a judicial precedent but it is logical and persuasive. The Attorney General noted that in order to qualify as a guest an applicant must be of a specified minimum age, contribute a founder's fee of about $5,000.00 and pay successive monthly charges for room and board and minor medical care. The profits would be used to retire the mortgage on the property and any excess would go to the sponsoring church for its general charitable purposes. It was the Attorney General's opinion that such an organization would not be entitled to exemption since the furnishing of the services for the stated consideration could not be classed as a scientific, municipal, educational, literary, religious or charitable purpose. Opinion of Attorney General 061-175. See also opinion of Attorney General 061-202.
A considerable number of Florida's welcome aggregation of elderly citizens have paved their way to retirement, offering a challenge to those who make it their business to meet various demands for lodging and accompanying necessities of life. These retired people do not regard themselves as public charges, though in some instances their means are limited.
If in effect we were to consider such residents as wards of the state, it probably would result in a multiplicity of non-profit homes which, by providing token or incidental charitable concessions, could cause a flood of tax exemptions inuring actually or potentially to the benefit of patrons who are not really in financial distress. This points up the infirmity of plaintiff's position. While it sincerely urges the merit of its cause, in the offing are others with perhaps lesser moral claim on the public largesse but with purposes which are basically no less worthy. There are benevolent aspects to many operations which are not charity according to law.
Just treatment under law is due every property owner. By the same token resistance to importunate demands is expected of tax officials in their efforts to achieve and maintain fundamental uniformity in taxation. Apparently the urge for exemption is given added impetus by fear of progressively higher taxation and the unfortunate imbalance in our tax structure by which one property is wholly or partially relieved while its approximate counterpart and other properties are additionally burdened.
It has been pointed out that the plaintiff continues to serve one resident who became unable to meet his recurring contractual obligations. This must be deemed a calculated risk not unlike that undertaken by an insurer. The possibility of a resident outliving his income is a foreseeable contingency that would normally enter into the general contractual arrangement for founder's fees and monthly charges.
Institutions like that of the plaintiff are in the highest American tradition. They serve to mitigate realistically some of the rougher aspects of retirement that are not altogether financial. Our affinity for the elderly makes us especially aware of these problems. We are also mindful that exemption of plaintiff's property could financially benefit to a degree the residents of its fine establishment, and we are deeply sympathetic. On the other hand, as stated, the record convinces us that the plaintiff is substantially recompensed its expenditures by these very residents who are not shown to be charity cases in the sense necessary to sustain the plaintiff's suit. Cf. People ex rel. Nelson v. Rockford Lodge, 1932, 348 Ill. 528, 181 N.E. 432; 83 A.L.R. 777. We thus conclude that the plaintiff, though altruistically motivated and serving a socially constructive purpose, is nevertheless a financially viable institution whose property is not entitled to exemption from taxation.
The decree accordingly is reversed and the cause remanded with directions to enter a decree consistent with this opinion.
KANNER, (RET.), J., and FARRINGTON, OTIS, Associate Judge, concur.
NOTES
[1] Fla. Stat. § 192.06(3), F.S.A.  specifically the portions of said subsection relating to exemption premised on "benevolent" or "charitable" use of institutional property.
[2] The defendants submit that this "deficit" figure is no more than an unrealistic paper loss since income derived through founder's fees and working interest are not figured in the computation; that plaintiff's balance sheet shows that it has increased its net worth thirty fold through increments amounting to more than a million and a half dollars, which growth is consistent only with a profitable operation.
[3] The plaintiff's charter states that "* * * any gain made in the operation * * * shall be used in the expansion and improvement of said homes or in furnishing or partly furnishing homes for aged or infirm people unable to pay in full * * *." (Emphasis added.)
[4] Reference to comments of informed laymen on the practical importance of this problem from the standpoint of the public is not inappropriate inasmuch as the involvement of the public interest is a principal reason for the rule of strict construction of tax exemption laws. On July 11, 1964, Warren P. Hunnicut, prominent citizen and expert appraiser, told the Florida Association of Realtors that "With steadily increasing property taxes to meet demands of growing and expanding communities for governmental services, the tax base needs to be broadened instead of whittled away." Deploring the trend of property tax exemptions toward favored segments, he concluded that Florida cannot reach its potential if the tax load is continually piled on fewer and fewer non-exempt properties, but that the load would not be excessive if each property bore its fair share of the costs of government. Reported in The Clearwater Sun, Sunday, July 12, 1964, page 1B.

A graphic projection of the effects of such exemptions in one populous Florida County is contained in an article by Douglas Doubleday in the St. Petersburg Times, issue of May 17, 1964, page 1B.
[5] Cf. Miami Battlecreek v. Lummus, 1939, 140 Fla. 718, 192 So. 211. The 6th headnote of the syllabus by the court reads as follows: "The fundamental ground, on which all tax exemptions in favor of charitable institutions are based, is benefit conferred on public by such institutions and consequent relief, to some extent, of burden imposed on state to care for and advance its citizens' interests." See also Lummus v. Cushman, supra, which held that an exemption will be granted only when and to the extent that it may be deemed to conserve the general welfare.
[6] If our courts should adopt and adhere to the loosely subjective concept of a charitable institution with respect to tax exemption, it would be an enlargement of constitutional meaning presaging further inequity and deterioration of an ad valorem system that could be redeemed only by ultimate reform through legislative channels. See Maxcy, Inc. v. Federal Land Bank of Columbia, 1933, 111 Fla. 116, 119, 150 So. 248, 151 So. 276. State ex rel. Miller v. Doss, 1941, 146 Fla. 752, 753, 2 So.2d 303.
[7] Most hospital association are now committed to public as well as private or special health services, which services are distinct from the furnishing of board and keep and incidental services. Hospitals are separately treated in §§ 192.06(3), 192.06(9), 192.06(11) a, Fla. Stat., F.S.A.
[8] The Supreme Court of Florida likewise said in Johnson v. Sparkman, 1947, 159 Fla. 276, 31 So.2d 863, 172 A.L.R. 1067: "Property exempt from taxation under the Constitution for charitable and educational purposes has reference only to such property as is dedicated to the public and used exclusively for that purpose or to such extent as Section 192.06, Florida Statutes of 1941, F.S.A., defines." (emphasis added) See also Coppock v. Blount, Fla.App. 1962, 145 So.2d 279, 282.
[9] This case does not concern a hospital, but generally hospitals are not exempt from taxation merely because as an incident to their operation they administer to charity patients. Annotation 34 A.L.R. 635, 649. Hospitals have been exempted where they can show a prime obligation to care for those who otherwise would become charges upon society. Conversely when the basic purpose is to administer to those from whom it derives income and who are not indigent or public charges, a hospital has been held a non exempt enterprise notwithstanding some charity patients may be cared for on a non-obligatory basis. See San Antonio v. Santa Rosa Infirmary, Tex.Civ.App., 1923, 249 S.W. 498, reversed on other grounds, 259 S.W. 926, Southwestern Osteopathic Sanitarium v. Davis, 1926, 115 Okla. 296, 242 P. 1033. Compare Miami Battlecreek v. Lummus, supra; annotation 62 A.L.R. 328, 331.