**HOLY SPIRIT RETIREMENT HOME, INC., Appellee,**

v.

**The BOARD OF REVIEW OF the CITY OF SIOUX CITY, IOWA, Its Chairman Robert J. Clark, and Melvin J. Obbink, Sioux City Assessor, Appellants.**

**No. 94–0680.**

Court of Appeals of Iowa.

Nov. 27, 1995.

Jack A. Fath, Sioux City, for appellant.

Craig S. Berenstein of Berenstein, Moore, Moser, Berenstein & Heffernan, Sioux City, for appellee.

Heard by DONIELSON, C.J., and HAYDEN and CADY, JJ., but decided by DONIELSON, C.J., and HAYDEN, SACKETT, HABHAB, and CADY, JJ. HUITINK, J., takes no part.

PER CURIAM.

Holy Spirit Retirement Home, Inc. (Holy Spirit) is an organization owned by the Roman Catholic Diocese of Sioux City. In 1985 Holy Spirit filed a claim for tax exemption and a statement of objects and uses for real estate which consisted of a nursing home for the elderly and ill. At the time, Holy Spirit consisted only of a nursing home which provided care for those individuals who were unable to care for themselves and the terminally ill with twenty-four-hour-a-day nursing care. The nursing home was given tax exempt status in 1985.

In 1988 Holy Spirit had ground breaking for an apartment division to be added to the nursing home division. The apartment division consists of twenty-four units, with sixteen one-bedroom units and eight two-bedroom units. The units are unfurnished, carpeted, and equipped with major appliances and handrails in the hallways. All other furnishings must be acquired at the resident's expense. The basic residency deposit fee charged is $40,000 for a one-bedroom unit and $60,000 for a two-bedroom unit. Since its inception, Holy Spirit has waived the residency fee on four occasions for persons who were priests of the Sioux City Catholic Diocese. Holy Spirit maintains this fee during occupancy and does not give interest payments to the residents who pay the fee. After a person's residency has terminated, the resident receives ninety percent of the fee less $3500 for a one-bedroom or $5000 for a two-bedroom unit.

Applicants are required to complete a "Confidential Financial Profile" whose stated purpose is to assure an applicant's financial resources are adequate to fulfill the applicant's needs at Holy Spirit's Apartments. The disclosure statement states all applicants "must have assets adequate to pay the residency fee plus sufficient amounts to provide for their financial requirements after becom-

ing a resident, including the monthly service fee of $481.25." The average income of Holy Spirit's residents is $26,143.00.

The monthly service fee includes occupancy, one meal per day, security system, fire protection, emergency call system, four hours of monthly housekeeping services, water and sewer, lawn care with snow removal, a visiting medical nurse available for up to eight hours per week, a temporary nursing service, physical therapy sessions, ground transportation, a beauty salon, and a chapel. According to the administrator of Holy Spirit, the nursing services include such things as cutting toenails, administering eye drops, and assisting with medication. Holy Spirit also offers and lends wheelchairs to residents returning from surgery.

The monthly fee had never been waived until December 1993, two months before trial. The disclosure statement gives Holy Spirit the right to terminate residency upon thirty days written notice if a resident fails to pay the monthly service fee. Although Holy Spirit developed a retirement home foundation in November 1991, as of the date appellate briefs were filed, no funds from the foundation were used to pay rent for residents in the apartment division. Additionally, if a resident cancels the residency agreement before establishing residency, a $500 application fee is charged and the prospective resident is required to pay any costs incurred by Holy Spirit.

In addition to the financial requirements set out in Holy Spirit's disclosure statement, the statement also specifies an applicant must be in "sufficiently good health to live without assistance." A doctor's report is required prior to establishing residency. This report requires a physician certify the prospective resident is physically capable of independent living and is not a carrier of any infectious disease.

Prior to January 1992 all properties owned by Holy Spirit were exempt from property taxation. In January 1992 and January 1993, however, the city assessor assessed $982,000 taxable value for the apartment division owned by Holy Spirit which was added to the nursing home in 1986. The nursing home remained exempt. Holy Spirit appealed the assessment to the city board of review which affirmed the city assessor's action. Holy Spirit filed appeals to the district court for both years.

The district court held Holy Spirit's apartment division qualified for tax exemption because: (1) Holy Spirit was a charitable, benevolent, and religious institution; (2) the actual use of the property was to carry out the Catholic church's mission to serve people in accordance with religious tenets; and (3) the property was not leased and was not used with a view to pecuniary profit. The district court also stated Holy Spirit was not required to file a new statement of objects and uses after 1985 in order to maintain its exempt status despite adding the apartment division.

The city assessor and the city board of review appeal. They contest whether Holy Spirit is acting in a charitable, benevolent, or religious manner in relation to the apartment division and whether the actual use of the property is solely for its appropriate objects. They state several examples of Holy Spirit's policy and procedures, such as requiring financial and physical independence from the residents, which they believe are more akin to a commercial venture than the warmth and spontaneity of charitable impulse. Finally, they contend Holy Spirit should have filed a new claim for exemption stating the uses and objects of the apartment dwellings because such uses and objects differed from those stated in the last claim for exemption in 1985 when the property was used only as a nursing home.

## I. Scope of Review.

The issue in this case is whether Holy Spirit's apartment division should be given tax exempt status. Iowa Code section 441.39 (1991) provides in part:

> The court shall hear the appeal in equity and determine anew all questions arising before the board which relate to the liability of the property to assessment or the amount thereof. The court shall consider all of the evidence and there shall be no

presumption as to the correctness of the valuation of assessment appealed from.

We, therefore, review tax assessment cases de novo. Iowa R.App.P. 4. We give weight to the fact findings of the trial court, especially when considering the credibility of witnesses, but are not bound by them. Iowa R.App.P. 14(f)(7). We look at the decision of the Board of Review rather than the decision of the district court. *Mayflower Homes v. Wapello County,* 472 N.W.2d 632, 634 (Iowa App.1991).

■ We strictly construe the statutes exempting property from taxation. *Atrium Village v. Board of Review,* 417 N.W.2d 70, 72 (Iowa 1987). Any doubt concerning an exemption must be resolved in favor of taxation. *Id.* The burden of proof is on the party claiming the exemption to show the property should not be taxed. *Id.*

Iowa Code section 427.1(9) (1993) sets forth the classes of property which are exempt from taxes and provides in pertinent part:

> The following classes of property shall not be taxed: ... Property of religious, literary and charitable societies. All grounds and buildings used ... by ... charitable, benevolent ... and religious institutions and societies solely for their appropriate objects, ... not leased or otherwise used ... with a view to pecuniary profit.

As such, there are three requirements Holy Spirit must meet in order to gain tax exempt status for its apartment division. First, the property must be used by a charitable, benevolent, or religious institution or society. Iowa Code § 427.1(9).

> The second requirement ... narrows the kind of use which qualifies property for exemption: the use by religious [and other listed types of] institutions and societies must be *"solely* for their appropriate *objects."* (Emphasis added.) Third, the property must not be used or leased "with a view to pecuniary profit."

*St. Ambrose Univ. v. Board of Review,* 503 N.W.2d 406, 407 (Iowa 1993) (quoting *Congregation B'Nai Jeshurun v. Board of Review,* 301 N.W.2d 755, 756 (Iowa 1981) (quoting Iowa Code § 427.1(9) (1979)).

## II. Exemption for Holy Spirit Apartment Division.

■ The issue raised in this appeal is whether Holy Spirit's apartment division is entitled to tax exempt status as is the nursing home. As stated, property shall not be taxed if it is the property of a religious, literary, charitable, or benevolent society. Iowa Code § 427.1(9). First, we must determine whether Holy Spirit's apartment division is a *religious* society. It is the character of the use, rather than the identity of the owner, which determines whether an organization's property is exempt from taxation. *Iowa Methodist Hosp. v. Board of Review,* 252 N.W.2d 390, 392 (Iowa 1977). We find the apartment division is not used for religious purposes despite being owned by the Catholic Diocese of Sioux City. As appellant points out, the apartment division is not a place of worship; rather, it is a residential structure.

■ Because Holy Spirit's Apartments do not gain tax exempt status as a religious society, we next must determine whether Holy Spirit's apartments gain tax exempt status because of their charitable or benevolent nature. Whether an organization and its "appropriate objects" are charitable is a question of fact. *Mayflower Homes,* 472 N.W.2d at 634 (quoting *Friendship Ctr. W., Inc. v. Harman,* 464 N.W.2d 455, 457 (Iowa App.1990)). Both appellant and appellee have listed several criteria used in determining whether the policy and practice of an institution is charitable or benevolent.

■ Among the factors include: whether nursing care is provided to the residents, *Mayflower Homes,* 472 N.W.2d at 634; whether admission to the facility is limited to the physically and financially independent, *Atrium Village, Inc.,* 417 N.W.2d at 72; whether the institution makes concession on fees to residents who are unable to pay, *id.* at 73; whether there is a policy against retaining residents who are unable to pay the fees, *id.;* whether there exists and the residents are informed of a fund to help pay residents' rent, *id.* at 71; whether applicants are screened to determine if they fall below a certain income level, *Friendship Ctr. W.,*

*Inc.*, 464 N.W.2d at 459; and, whether donations result in a reduction of the payments each resident is required to make, *Richards v. Iowa Dep't of Revenue*, 414 N.W.2d 344, 353 (Iowa 1987).

▮ Considering the above factors, Holy Spirit's apartment division does not have a charitable or benevolent purpose. The facts in the case at bar are very similar to those of *Mayflower Homes*, 472 N.W.2d at 632. In *Mayflower Homes, id.* at 635, this court held the residence for elderly people was not entitled to complete tax exempt status. We determine *Mayflower Homes* is controlling of this issue and hold the apartment division is not entitled to tax exempt status.

The facts of *Mayflower Homes* were as follows: Mayflower Homes was organized to provide retirement housing for elderly employees of United Church of Christ; however, there was no denominational requirement for acceptance at the home, *id.* at 633; the home did not admit those unable to provide care for themselves, *id.* at 634; no extra nursing care was provided to the residents, *id.* at 633; the initial entrance fee ranged from $18,000 to around $50,000 depending on the unit acquired, *id.* at 634; only five full or partial exemptions (three percent) of the initial entrance fee had ever been granted, *id.* at 633; a resident had to be connected with the church in order to get an exemption, *id.* at 634; there was a monthly maintenance fee of around $200 to $300, *id.;* and, no monthly fee was ever waived, *id.* at 633. The court reasoned the ordinary taxpayer should not be asked to subsidize an operation simply because it chooses to operate at a loss. *Id.* at 634. The court further stated the fact the home was established by a charitable endowment was not controlling. *Id.*

The plain language of Holy Spirit's disclosure statement reveals physical and financial independence is required of residents. Generally, homes will be taxed where admission is limited to the physically and financially independent. *Friendship Ctr. W., Inc.*, 464 N.W.2d at 457. With regards to financial independence, we are particularly persuaded by the wording of the disclosure statement. As mentioned above, the statement reads,

"all applicants must have assets adequate to pay the residency fee plus sufficient amounts to provide for their financial requirements after becoming a resident, including the monthly service fee." Residents must pay a large residency fee—$40,000 or $60,000. The residents do not receive interest on this large sum of money and do not get a complete refund upon termination of the residency. In addition to the initial fee, residents must pay $481.25 per month. Holy Spirit claims to have a fund to help pay residents' rent; however, no money from the fund has been used for rent.

Additionally, the record does not reveal Holy Spirit acts charitably or benevolently in making concessions on fees if a resident is unable to pay. Although Holy Spirit claims to make concessions on fees of residents who are unable to pay, concessions on the initial fee have only been made on four occasions. Each time the initial fee was waived for a priest of the Sioux City Catholic Diocese. Furthermore, the monthly fee was never waived until the eve of trial. We are further convinced by the language of Holy Spirit's disclosure statement which grants the facility the right to terminate residents who are unable to pay their fees. Although Holy Spirit claims admission is not restricted to the financially independent, the record indicates otherwise.

With regards to the physical condition of the residents, we are once again persuaded by the plain language of the disclosure statement which states applicants must be in "sufficiently good health to live without assistance." Clearly, the purpose of Holy Spirit's apartment division is not to provide medical care for its residents but, rather, to provide living quarters for those who can care for themselves. Although Holy Spirit claims to provide nursing services and medical equipment to its residents, the record reveals the care provided is very minor. If a resident undergoes surgery, Holy Spirit will lend a wheelchair to the resident from its nursing home facility. Additionally, testimony reveals the nurses do such things as cut toenails and assist residents with their medication. Considering the amount of money residents pay in the initial fee and monthly

payment, it is obvious the residents have adequately paid Holy Spirit for the nursing services provided. Again, the record indicates Holy Spirit is designed to accommodate only those who can afford the services provided.

We determine Holy Spirit's apartment division does not have a religious, charitable, or benevolent purpose. The apartments were designed to accommodate only those who could well afford to pay for the services provided. As the *Mayflower* court stated,

> Taxes lost to the public by reason of an exemption must be exacted from all other taxpayers. Hence the law requires that the institution be run for those who have a real need for it. If it is operated only for those who can well afford to pay their taxes it is not right to pass that burden along to others.

*Mayflower Homes*, 472 N.W.2d at 634–35 (quoting *Atrium Village*, 417 N.W.2d at 73). As such, we determine the Board of Review was correct in finding Holy Spirit's apartment division was not exempt from taxation. We reverse the decision of the district court and affirm the Board of Review.

### III. Failure to File a New Claim for Exemption.

Because we have reversed this case on the first issue presented, it is unnecessary for us to examine the second issue.

**REVERSED.**

DONIELSON, C.J., and HAYDEN and CADY, JJ., concur.

SACKETT, J., dissents without opinion.

HABHAB, J., dissents.

HABHAB, Judge (dissenting).

I respectfully dissent. I would affirm the trial court.