607 S.E.2d 379

**MAPLEWOOD COMMUNITY, INC.,
Petitioner Below, Appellant**

**v.**

**Rebecca Melton CRAIG, State Tax Commissioner, and Cheryl L. Romano, Assessor of Harrison County, Respondents Below, Appellees**

**Mon Elder Services, Inc., Petitioner Below, Appellant**

**v.**

**Monongalia County Commission, Sitting as a Board of Review and Equalization, and John Pyles, Robert Bell and Asel Kennedy, Sitting as a Board of Review and Equalization, Rodney A. Pyles, Assessor of Monongalia County, and Rebecca M. Craig, State Tax Commissioner, Respondents Below, Appellees**

No. 31657, 31698.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 14, 2004.

Decided Nov. 12, 2004.

Concurring Opinion of Justice Starcher Dec. 23, 2004.

Sara E. Hauptfuehrer, Walter L. Williams, Thomas A. Vorbach, Steptoe & Johnson PLLC, Clarksburg, West Virginia, Attorneys for the Appellant, Maplewood Community, Inc.

Darrell V. McGraw, Jr., Attorney General, Stephen Stockton, Senior Assistant Attorney General, Charleston, West Virginia, Attorneys for the Appellee, Rebecca Melton Craig, State Tax Commissioner.

Robert J. Andre, Assistant Prosecuting Attorney, Clarksburg, West Virginia, Attorney for the Appellee, Cheryl L. Romano, Assessor of Harrison County.

John A. Mairs, Louis S. Southworth, II, Jackson Kelly PLLC, Charleston, West Virginia, Attorneys for the Appellant, Mon Elder Services, Inc.

Philip M. Magro, Assistant Prosecuting Attorney, Morgantown, West Virginia, Attorney for the Appellee, Monongalia County Commission.

James A. Walls, Spilman, Thomas & Battle, PLLC, Morgantown, West Virginia, Attorney for Amicus Curiae, Morgantown Area Chamber of Commerce.

Thomas A. Heywood, Bowles, Rice, McDavid, Graff & Love, PLLC, Charleston, West Virginia, Attorney for Amicus Curiae, The West Virginia Hospital Association.

PER CURIAM:

The primary issue presented through these two consolidated cases is whether Appellants,[1] who both operate assisted living and independent living facilities for seniors, are subject to ad valorem property taxation. By separate order, the Circuit Courts of Harrison County and Monongalia County respectively rejected Appellants' argument that they should be exempt from ad valorem property tax assessments based on their contention that they both operate facilities which serve charitable purposes. Upon our review of these cases, we conclude that Appellants, despite their status as charitable organizations for federal income tax purposes, do not qualify under state law as organizations whose property is used exclusively for charitable purposes.[2] Consequently, Appellants fail to come within the recognized definition of a charity under state law and are not entitled to the tax exemption provided by statute for property used for charitable purposes.[3] Finding no error to have been committed by the courts below with respect to rejecting Appellants' exemption from ad valorem property taxes based on charitable purpose operations, we affirm the respective decisions of the circuit courts on this issue. Pertinent only to the Mon Elder case were two separate assignments of error concerning whether the leasehold interest held by Mon Elder has assessable value separate from the underlying value of the property and whether the Monongalia County Assessor erred in making a back tax assessment in 2002 for taxes allegedly owed in 2001. Because the lower court did not rule on either of these two assignments of error and because they require certain factual and legal determinations before meaningful appellate review can occur, we remand those two limited issues to the Circuit Court of Monongalia County.

1. Maplewood Community, Inc. and Mon Elder Services, Inc.

2. *See* W.Va. R. *Taxation* §§ 110–3–2.9; 110–3–19.

3. W.Va.Code § 11–3–9(a)(12) (1998) (Repl.Vol. 2003).

## I. Factual and Procedural Background

### A. Maplewood

Maplewood Community, Inc. ("Maplewood"), a not-for-profit West Virginia corporation that is exempt from federal income tax,[4] operates a senior community comprised of two types of living facilities in Harrison County. In one building, there are eighty-four independent living apartments that share common areas. The other building, known as "The Meadows at Maplewood," is comprised of forty-four assisted living units that also share common areas. As a "residential care community," the Meadows is subject to state licensing laws with regard to the provision of personal and health care services.

Maplewood was created by United Hospital Center, Inc., ("UHC"), which is a not-for-profit acute care community hospital. During the construction and development phase, UHC contributed $1.5 million to Maplewood. UHC is also a co-obligor on certain tax exempt bonds that were issued to provide the balance of the required financing. Maplewood suggests that UHC's financial contributions are essentially gifts to the community because UHC receives no direct financial benefit from these contributions.[5] Maplewood receives no government subsidies and was built solely through private funding. To date, Maplewood has not experienced a positive cash flow, but if it should ever realize a profit from its operations, Maplewood represents that such moneys would be used to further its mission of providing services to its residents at the lowest feasible cost.

Prior to moving in, residents of the independent living apartments pay a substantially refundable deposit.[6] The amount of the deposit depends on the size of the apartment and ranges from $63,100 to $115,700. Under the terms of the residency agreement that pertains to the independent living units,[7] the residents receive a lifetime right to occupy their respective apartments. Upon either the death of the resident or the termination of his/her residency, ninety-five percent of the initial deposit will be refunded for a single occupancy or ninety percent in the case of dual occupancy.[8]

Independent living residents pay a monthly service fee ranging from $1,267 to $2,428, depending on the size of the apartment and number of residents.[9] That monthly service fee covers items such as one meal per day; bi-weekly housekeeping; utilities; security system and emergency alert monitoring; bi-weekly laundry of linens; routine maintenance and repairs; local transportation; social/recreational programming; payment of taxes and insurance on the building grounds; parking space; storage area; wellness program; medical advisor; priority admission to assisted living facility owned by Maplewood; priority transfer to nursing care at The Heritage; and a long-term care benefit program. The residents can pay separately for additional services such as housekeeping; personal laundry; and personalized transportation. If a Maplewood resident fails to pay the monthly service fee associated with his unit, Maplewood retains the right to termi-

---

**4.** *See* 26 U.S.C. § 501(c)(3) (2000).

**5.** We note, however, that residents of Maplewood receive priority in being admitted to The Heritage, a nursing home facility that is a for-profit subsidiary of UHC. The Heritage is located just adjacent to Maplewood.

**6.** Due to the shortened duration of residency in the assisted living units—two to two and a half years on average—no deposit is required for residency in those units.

**7.** To qualify for residency in the independent living units,

> Maplewood requires that Resident be capable of performing the functions associated with independent living, be free of communicable

disease which presents a direct threat to the health or safety of Resident, other residents or staff, be at least 62 years of age, and have assets and income which are sufficient (under foreseeable circumstances and after provision for payment of Resident's obligations under this Agreement) to meet ordinary and customary living expenses after assuming occupancy.

**8.** The return of the deposit is made without benefit of any interest. Pursuant to the residency agreement, Maplewood is permitted to use the entire deposit for purposes of generating investment income.

**9.** The monthly service fee charged for residency in an assisted living unit ranges from $2,651 to $3,769.

nate the residency agreement.[10]

Maplewood's residents living in the independent living units range in age from 63 to 96 and the individuals residing in the assisted living apartments range from 77 to 100. These residents include a cross section of society as they are former teachers, secretaries, bookkeepers, bankers, coal miners, machinists, attorneys, nurses, railroad workers, and homemakers. According to Maplewood, most of its residents are of modest financial means, with 54% of the residents in independent living units and 68% of the residents in assisted living units reporting their net worth at less than $500,000.

Maplewood introduced testimony below to show that by providing its residential services, individuals are permitted to remain in areas proximate to where they spent active adult lives, which has the secondary benefit of allowing those citizens to attend worship services at their home church; shop where they have always shopped; continue their medical care with established physicians; and continue to volunteer and be actively involved in the local community. According to Maplewood's expert testimony, the availability of facilities such as Maplewood translates favorably for society as a whole by delaying the need for higher, more expensive levels of care, such as nursing home facilities.

On October 8, 2001, Maplewood filed a formal, written objection to the Harrison County Assessor's determination that Maplewood's property is subject to ad valorem taxation. Following the Assessor's denial of the objection, Maplewood requested that the Assessor certify the issue of taxability to the State Tax Commissioner. *See* W.Va.Code § 11–3–24a (1961) (Repl.Vol.2003). On February 28, 2002, the State Tax Commissioner, through Property Tax Ruling 02–05 Revised, denied Maplewood's request for relief from

ad valorem taxation; a lower property classification; and tax preferences under the homestead exemption.[11] Maplewood appealed that decision to the circuit court and by ruling entered on April 4, 2003, the circuit court concluded that Maplewood was not exempt from ad valorem taxation "because its property is not used for primarily charitable purposes and an indefinite number of people do not benefit from said property." Through this appeal, Maplewood seeks a reversal of the unfavorable tax ruling issued below.

### B. Mon Elder Services

Mon Elder Services, Inc. ("Mon Elder") operates a not-for-profit senior living community in Monongalia County known as "The Village at Heritage Point," which comprises both independent living apartments and assisted living units. Like Maplewood, Mon Elder is exempt from federal income taxes under 26 U.S.C. § 501(c)(3). Conceptually, Mon Elder resulted from discussions initiated by the Morgantown Area Chamber of Commerce regarding the need to develop a retirement community to curtail the relocation of retirees to other locales. When the proposals of developers interested in building a for-profit retirement community were rejected as too costly, Monongalia Health Systems, Inc.[12] decided to incorporate Mon Elder for the purpose of creating a retirement community to fulfill the needs of a certain demographic group of retirees.[13]

To aid in the capitalization of Mon Elder, Monongalia Health Systems donated 11.35 acres of land located near Monongalia General Hospital and further contributed approximately $1.6 million in cash. Additional funding necessary for the construction of the facilities at Mon Elder was realized through the sale of approximately $20 million in tax exempt development bonds, which were is-

---

**10.** Under the agreement, Maplewood can choose to defer payment when a resident becomes unable to pay the monthly service fee. Any amount deferred is treated as a debt and Maplewood may apply a portion of the resident's deposit to cover any shortfall.

**11.** *See* W.Va.Code § 11–6B–3 (1990) (Repl.Vol. 2003).

**12.** Monongalia Health Systems, Inc., a 501(c)(3) corporation, is the parent of several subsidiary

corporations that provide health services to the Morgantown area, including Monongalia General Hospital, Morgantown HealthCare Corp. (nursing home), Mon Health Care (medical equipment company), and Mon EMS (ambulance company).

**13.** Mon Elder was incorporated on January 2, 1997.

sued by the Monongalia County Building Commission ("Building Commission").[14] The property on which the senior community is located was conveyed to the Building Commission by Mon Elder on December 12, 1997. Mon Elder and the Building Commission entered into a lease arrangement under which Mon Elder pays rent to the Building Commission sufficient to amortize the principal and interest on the tax exempt bonds. Under the terms of the lease, Mon Elder cannot transfer, lease, sub-lease, or otherwise convey its interest in the lease to any other party without the consent of the Building Commission. At the end of the lease term, the Building Commission retains ownership of the Village and there is no purchase option giving Mon Elder the right to acquire the property.

The Village operation consists of ninety independent living apartments and forty assisted care living units. Like the services provided by Maplewood to its residents, the Village similarly supplies its residents with one daily meal; light housekeeping; linen service; maintenance services; emergency call system; wellness and preventative maintenance programs; as well as scheduled transportation to local shopping areas, medical facilities, and places of worship. In addition, there are numerous services offered to enhance the residential experience that include arts and crafts; library facilities; exercise classes; and other opportunities for social interaction.

For these services, residents of the independent living apartments pay a flat monthly service fee ranging from $1,450 for a one-bedroom apartment to $2,100 for a two-bedroom apartment. Residents also pay a substantial deposit prior to moving into their independent living unit that ranges from $72,175 to $151,025. These deposits are refunded to the resident or his estate upon the resident's departure or relocation into the assisted living facilities.[15] Residents of the assisted living units pay a higher monthly service fee than the independent living residents due to the increased level of care they receive.[16] The Village policies provide that residents will not be forced to leave if they are unable to pay, except if they have squandered their resources or if non-payment would threaten the continued existence of Mon Elder.[17]

Mon Elder represents that the Village was designed to be affordable to retirees of modest to a little better financial means.[18] By retaining the talents and services of educated and community-minded retirees, Mon Elder maintains that it is fulfilling a significant public interest. Through evidence submitted below, Mon Elder demonstrated that its residents perform volunteer work throughout the community that includes contributions of their time and services at local hospitals, nursing homes, and in elementary schools.

The legal proceedings involving Mon Elder began with an assessment by the Monongalia County Assessor against the Building Commission's interest in the Village. In response to an assessment for tax year 2001, Mon Elder requested that the Assessor exempt the Village as property used for charitable purposes. When this request was rejected, Mon Elder and the Assessor jointly requested that the Tax Commissioner issue a property tax ruling addressing whether the Village was exempt from ad valorem taxation based on the Building Commission's ownership of the property and the charitable purposes performed by the Village. By ruling dated February 28, 2001, the Tax Commissioner concluded that the Building Commis-

14. The Monongalia County Commission, in approving the development bonds, found that the building of the Village was in the public interest and for the public's benefit.

15. The amount of the refund is 95% for single occupancy and 90% for dual occupancy.

16. A deposit is not required when residents move into the assisted living units.

17. Mon Elder represents that it has never had to terminate a resident due to his/her inability to pay the required monthly fees.

18. The financial feasibility study estimated that in 1997 there were more than 2,500 households in the Morgantown area meeting the age and income requirements for the Village and that by 2002 that number was estimated to increase to over 3,100.

sion was exempt from property tax based on its status as a political subdivision.[19]

Adopting a different tack for tax assessment in 2002, the Monongalia County Assessor issued an ad valorem property tax assessment against Mon Elder for its leasehold interest in the Village.[20] At the same time the 2002 assessment was issued, the Assessor made an identical back tax assessment of Mon Elder's leasehold interest in the Village for the tax year 2001. Upon receipt of these tax assessments, Mon Elder renewed its previous request that the Assessor exempt the Village from ad valorem taxation due to the charitable purposes allegedly served by the Village. In response to the Assessor's rejection of this second request for tax exemption, Mon Elder and the Assessor jointly filed a request for a new tax ruling by the Tax Commissioner. On February 28, 2002, the Tax Commissioner issued Property Tax Ruling 02–10, indicating that it did not have sufficient information which demonstrated that the Village was used exclusively for charitable purposes.

Mon Elder continued to protest its tax assessments for 2001 and 2002 to the Board of Review, before which a hearing was held on February 26, 2002. By order dated February 28, 2002, the Board of Review affirmed the Assessor's appraisals against Mon Elder for both tax years. On March 26, 2002, Mon Elder filed an appeal of the Assessor's determination that the Village was not used for charitable purposes with the circuit court and simultaneously filed its appeal from the Board of Review's decision. By order dated June 17, 2003, the circuit court affirmed the ad valorem property tax assessments at issue. Failing to make any finding as to whether the subject property was being used for charitable purposes, the circuit court based its ruling on a finding that Mon Elder had failed to meet its burden of proof before the Board of Review.[21] The trial court failed

to rule on two other issues raised for its consideration: (1) whether Mon Elder's leasehold interest has any assessable value independent of the underlying value of the property; and (2) whether the Assessor's back tax assessment of Mon Elder's leasehold interest in the Village for 2001 was improper. Through this appeal, Mon Elder seeks a reversal of the lower court's ruling as to the validity of the assessments at issue; a determination as to the taxable value of its leasehold interest; and a ruling as to the propriety of the back tax assessment for 2001.

## II. Standard of Review

■ Our review in this case is *de novo* given the tax questions presented that require statutory and regulatory interpretation. *See* Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dep't*, 195 W.Va. 573, 466 S.E.2d 424 (1995) (holding that "[i]nterpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review"). Accordingly, we proceed to review these two cases to determine whether the respective circuit courts committed error with regard to their determinations that the subject not-for-profit corporations are subject to ad valorem property taxation in connection with their operation of senior communities.

## III. Discussion

### A. Charitable Purposes

■ The West Virginia Constitution provides that all property is subject to taxation unless expressly exempted. W.Va. Const. art. X, § 1. Our state constitution specifically designates the following classifications of property as subject to exemption: "property used for educational, literary, scientific, religious or charitable purposes." *Id.* Acting upon the authority extended to it by the state

---

19. That ruling is identified as 01–06.

20. The Assessor appraised Mon Elder's leasehold interest in the Village at $14,889,918, based on construction cost information set forth in audited financial statements prepared for 2000.

21. The trial court did, however, cite to the April 4, 2003, decision by the Circuit Court of Harri-

son County in *Maplewood Community, Inc. v. Craig*, Civil Action No. 02–C–341–2, as "bolster[ing] the decision by this Court to deny the Petitioner's [Mon Elder] Petition and affirm the Board's decision in this matter" based on the "virtually indistinguishable" facts shared by both cases.

constitution,[22] the Legislature has provided for the exemption from taxation of "[p]roperty used for charitable purposes, and not held or leased out for profit." W.Va.Code § 11–3–9(a)(12) (1998) (Repl.Vol.2003).

By regulation the term charitable[23] is defined as follows:

The term "charity" means a gift to be applied consistently with the existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the gift itself if it is so described as to show that it is charitable. Any gift not inconsistent with existing laws which is promotive of science or tends to the education, enlightenment, benefit or amelioration of the condition of mankind or the diffusion of useful knowledge, or is for the public convenience is a charity.

W.Va. R. *Taxation* § 110–3–2.10.

Additional regulations address what constitutes charitable use of property:

19.1. Charities must be operated on a not-for-profit basis, must directly benefit society, must be for the benefit of an indefinite number of people, and must be exempt from federal income taxes under 26 U.S.C. § 501(c)(3) or 501(c)(4). Moreover, in order for the property to be exempt, the primary and immediate use of the property must be for one or more exempt purposes.

19.2. The beneficiaries of a charity may be limited to a class of beneficiaries bearing a rational relationship to the purpose of the charity.

19.3. A purported charity may not, however, limit the class of beneficiaries in such a way as to violate the definition of a charity.

W.Va. R. *Taxation* § 110–3–19.

■ This Court had the opportunity to apply the statutory exemption at issue in *Wellsburg Unity Apartments, Inc. v. County Commission,* 202 W.Va. 283, 503 S.E.2d 851 (1998). In affirming the exemption of a charitable organization that owned and operated an apartment complex providing subsidized housing to elderly or low income individuals,[24] we held that:

In order for real property to be exempt from ad valorem property taxation, a two-prong test must be met: (1) the corporation or other entity must be deemed to be a charitable organization under 26 U.S.C. § 501(c)(3) or 501(c)(4) as is provided in 110 C.S.R. § 3.19.1; and (2) the property must be used exclusively for charitable purposes and must not be held or leased out for profit as is provided in W.Va.Code § 11–3–9.

202 W.Va. at 284, 503 S.E.2d at 852, syl. pt. 3.

Despite the two-prong test established in *Wellsburg* for applying the statutory exemption set forth in West Virginia Code § 11–3–9(a)(12), that decision provides little guidance with regard to this case because the parties involved in that case had stipulated to the critical issue of whether the subject property was used exclusively for charitable purposes. 202 W.Va. at 287, 503 S.E.2d at 855. In quoting approvingly from the lower court's order in *Wellsburg,* we recognized that "the real property owned by the taxpayer is used for charitable purposes because based upon

---

**22.** As we noted in *Wellsburg Unity Apartments, Inc. v. County Commission,* 202 W.Va. 283, 503 S.E.2d 851 (1998), "[t]he West Virginia Constitution does not exempt property from taxation, but the Constitution empowers the legislature to create exemptions for certain types of property." *Id.* at 286, 503 S.E.2d at 854.

**23.** By regulation, the term "charitable" is defined as meaning "of, or for, charity." W.Va. R. *Taxation* § 110–3–2.9.

**24.** The monthly rental fees of the tenants residing in the apartments at issue was either 30% of the tenant's adjusted income or $25.00, whichever amount was greater. HUD reimbursed the charitable organization operating the apartments for the equivalent of 80% of the monthly rental fees. *See Wellsburg,* 202 W.Va. at 287–88, 503 S.E.2d at 855–56.

the stipulation reached between the parties it is uncontroverted that the property is being used for purposes of relieving poverty and for other purposes which are beneficial to the community." *Id.* at 289, 503 S.E.2d at 857. Other than establishing the status [25] and use tests for purposes of applying the charitable purposes exemption, the *Wellsburg* decision has minimal precedential effect with regard to the cases currently before us.

■ Because there is no dispute that both Maplewood and Mon Elder qualify as 501(c)(3) charitable organizations which are exempt from federal income tax, compliance with part one of the *Wellsburg* test (status test) for exemption from ad valorem taxation is easily met. What is contested in both cases, however, is whether the respective charitable organizations come within the second prong of that same test which requires that "the property must be used exclusively for charitable purposes and must not be held or leased out for profit." *Wellsburg,* 202 W.Va. at 284, 503 S.E.2d at 852, syl. pt. 3, in part.

Before we address whether Appellants can meet the use test necessary to be entitled to the desired tax exemption, we note their contention that the real issue before us is whether by requiring an initial deposit [26] and monthly fees they are precluded in a legal sense from performing a charitable purpose. While Appellants make appealing arguments regarding the benevolent services they are providing to a certain segment of society, with which we can only agree, the sole legal issue presented—entitlement to exemption from ad valorem property taxation—is not determined by whether the charitable organizations at issue come within a generalized concept of charity that involves benevolent acts extended to humankind for the purpose of relieving suffering or pain or for spiritual or educational enlightenment. Whether Appellants are entitled to the tax exemption which they seek must be determined with reference to the specific statute which is at issue and the various regulations that have been promulgated to help implement that statute. *See Haines v. St. Petersburg Methodist Home, Inc.,* 173 So.2d 176, 181, 185 (Fla.App.1965) (recognizing distinction between *legal concept* of "charitable institution entitled to exemption from ad valorem taxation" and societal view of charity, noting "[t]here are benevolent aspects to many operations which are not charity according to law"); *Western Mass. Lifecare Corp. v. Board of Assessors,* 434 Mass. 96, 747 N.E.2d 97, 103 (2001) (stating "although many activities and services are commendable, laudable and socially useful, they do not necessarily come within the definition of 'charitable' for purposes of the [property tax] exemption"). Appellants are essentially seeking a policy decision from this Court that entails the determination that a limited economic subset of this state's senior citizenry are exempt from property taxation based on their specific type of residential arrangements. [27] That issue, however, is not a judicial decision but a determination that must be made by the Legislature, either through expanded regulations or through a separate legislative enactment that specifically addresses whether not-for-profit corporations, such as Appellants, that provide alternative residential arrangements for this state's senior citizens are entitled to exemption from ad valorem property taxation.

---

**25.** The status test refers to part one of the *Wellsburg* test and references the need for an organization to initially qualify as a 501(c)(3) or (c)(4) organization under the federal tax code.

**26.** Applicable in the case of independent living residents.

**27.** While Appellants suggest that this can be accomplished simply by interpreting existing regulations which define charity or charitable purpose in an expansive manner, we disagree. The current regulations, as we explain in detail *infra,* clearly prohibit Appellants from falling within the definition of charitable purpose based on the exclusivity requirement of the charitable purpose being performed and the requirement that the organizations not limit their class of beneficiaries with the correlative requirement that their services must be provided to an indefinite number of persons. Based on the financial requirements related to both admission and continued residency, it cannot be disputed that Appellants do not provide their services to an indefinite number of individuals. Only those relatively few citizens who can meet the income floor established by the residency agreements can even be considered for admission to residency at Appellants' senior communities.

■ What we are limited to resolving today is whether under the statute and existing regulations Appellants come within the statutory requirement of fulfilling a charitable purpose. *See* W.Va.Code § 11–3–9(a)(12). Critical to our discussion is the limitation that to qualify for ad valorem property tax exemption a charitable organization must use its property *exclusively* for charitable purposes. *Wellsburg*, 202 W.Va. at 284, 503 S.E.2d at 852, syl. pt. 3, in part. This exclusive use requirement arises from our recognition in *State ex rel. Cook v. Rose*, 171 W.Va. 392, 299 S.E.2d 3 (1982), *overruled on other grounds by Morgantown v. W. Va. U. Med. Corp.*, 193 W.Va. 614, 457 S.E.2d 637 (1995), that "[a]ll property given a legislative exemption must be used primarily, directly and immediately for those enumerated purposes." 171 W.Va. at 394, 299 S.E.2d at 5. We explained in *Central Realty Co. v. Martin*, 126 W.Va. 915, 30 S.E.2d 720 (1944):

> [W]here real estate is used solely by an organization for education and charitable purposes and such use is immediate and primary the constitutional exemption from taxation applies, and the statute enacted in pursuance thereof inhibits any assessment for taxation; but real estate is not exempt where owned by a like organization and is leased for private purposes, notwithstanding the application of the income from rentals to charitable and benevolent purposes and upkeep of the premises.

*Id.* at 923, 30 S.E.2d at 725. Consequently, only when the use of property for charitable purposes qualifies as primary, direct, and immediate will such use come within the charitable purpose exemption; those uses that are secondary and remote clearly fall outside the contemplation of the statute. *See* W.Va.Code § 11–3–9(a)(12).

In addition to the exclusive use requirement that must be met by a 501(c)(3) charitable organization for entitlement to tax ex-

emption, there are further conditions that control whether such organization is determined to be exempt from ad valorem property taxation. One such requirement is that the charitable organization at issue must be "for the benefit of an indefinite number of people." W.Va. R. *Taxation* § 110–3–19.1. In making his ruling in the Maplewood case, Judge Bedell ruled that "Maplewood does not use its property to benefit an indefinite number of people because any potential class of beneficiaries will be determined based on financial criteria which excludes those on the lower end of the socioeconomic scale." Both senior communities at issue require as a precondition to residency a demonstration of certain minimum financial worth and the ability to pay the monthly fees associated with a particular type of living unit.[28] Under applicable state regulations, the charitable purpose tax exemption is not available where "in order to gain admittance a person must deposit a substantial amount of money which can be equated to a prepayment of rent." *See* W.Va. R. *Taxation* § 110–3–26.2.

While it is generally recognized that charging fees for services does not preclude an organization from qualifying as charitable,[29] courts have examined whether a charitable organization's entitlement to exemption from property taxation is affected by limiting admission for residency in a senior community to only those individuals with sufficient financial means. A Tennessee court examining the taxability of a retirement community in *Christian Home for the Aged, Inc. v. Tennessee Assessment Appeals Commission*, 790 S.W.2d 288 (Tenn.App.1990), and applying an analogous definition of charity that required exclusive charitable use for tax exemption purposes reasoned that by excluding those members of society who were "financially disabled," the charitable institution was not using its property "purely and exclusively for a charitable purpose." *Id.* at 292. The Ten-

**28.** We note that both Appellants include some provision for relief of a resident's inability to meet their monthly fees which would apply after those individuals have passed the initial financial screening requirements. Those requirements are designed to assure the charitable organizations that the individuals seeking residency have sufficient means to meet the required fees on an indefinite basis. *See infra* note 30 (explaining

necessity of such provisions for purposes of relief from federal income taxation).

**29.** *See Western Mass. Lifecare*, 747 N.E.2d at 104 and cases cited therein; *Raintree Friends Housing, Inc. v. Ind. Dep't of State Rev.*, 667 N.E.2d 810, 815–16 (Ind.Tax1996).

nessee court observed: "[T]hough the benefits of the Village are significant, only those who are financially and physically well off can receive them. Those less healthy and wealthy are not benefitted." *Id.*

Viewing large entrance fees, substantial rents, discretion to raise monthly fees, and the right to evict those who do not pay the monthly fees as "obstacles ... placed in the path of less fortunate individuals seeking residency," the appellate court in *Bethesda Barclay House v. Ciarleglio*, 88 S.W.3d 85 (Mo. App.2002), held that the retirement community at issue did not devote its property exclusively to charitable purposes and did not benefit an indefinite number of people. *Id.* at 94–95. Among those factors which the court in *Holy Spirit Home v. Board of Review*, 543 N.W.2d 907 (Iowa App.1995), identified as bearing on the issue of whether a charitable organization serves a charitable purpose are "whether admission to the facility is limited to the physically and financially independent" and "whether applicants are screened to determine if they fall below a certain income level." *Id.* at 910 (citations omitted). In denying property tax exemption to the apartment division of the retirement community, the court cited the large residency fee of $40,000 to $60,000 plus the monthly payment of $481.25 as evidence that "the purpose of Holy Spirit's apartment division is not to provide medical care for its residents but, rather, to provide living quarters for those who can care for themselves." *Id.* at 911. Rejecting the charitable organization's position that it served a charitable purpose, the Iowa appellate court found instead that "[t]he apartments were designed to accommodate only those who could well afford to pay for the services provided." *Id.* at 912.

As evidence of their charitable purpose objectives, both Appellants cite to language in their residency agreements stating that they will not force residents to relocate if they are unable to pay monthly fees.[30] Courts have concluded, however, that inclusion of contractual language prohibiting eviction upon a demonstrated inability to meet specified monthly fees is insufficient to offset an otherwise non-charitable purpose. In *Cape Retirement Community, Inc. v. Kuehle*, 798 S.W.2d 201 (Mo.App.1990), tax exemption was denied to a not-for-profit corporation that operated a retirement facility which screened its residential applicants based on financial resources. Despite the fact that the retirement community had in fact assumed obligations of insolvent residents, the appellate court held that "[i]t is not enough that Cape Retirement regularly underwrites some of the costs of qualified residents and agrees to fully support selected residents *if* such residents suffer financial reverses because its retirement home is not equally available to both rich and poor." *Id.* at 204. Critical to the Missouri court's decision was the fact that the financial screening requirements "limited meaningful access to the retirement home by the majority of the elderly." 798 S.W.2d at 203. By screening out lower income individuals, the application process was "structured to avoid the result of providing services to both the rich and the poor" and thereby failed to "benefit society generally" and " 'an indefinite number of persons.' " *Id.* at 203–04. Consequently, the court found that the retirement home was not operated " 'exclusively' for charitable purposes.' " *Id.* at 204; *see also Haines*, 173 So.2d at 180 (recognizing that property tax exemption could not be granted if charitable purpose objective of not-for-profit corporation was grounded solely on prospective use of operational gains to assist residents who became unable to meet their financial obligations in full).

In arguing their respective cases, Appellants urge us to view the definition of charitable purpose adopted by the Internal Revenue

---

**30.** For a corporation providing residential services for the aged to be viewed as a 501(c)(3) charitable organization exempt from federal income tax, the Internal Revenue Service requires that the organization must be able to demonstrate that it "operates in a manner designed to satisfy the three primary needs of aged persons" which are housing, health care, and financial security. As part of proving that it meets the financial security need of its residents, such organizations "must be committed to an established policy, whether written or in actual practice, of maintaining in residence any persons who become unable to pay their regular charges." Rev. Rul. 72–124, 1972–1 I.R.B. 145.

Service as persuasive of their positions. In Revenue Ruling 72–124, the following definition was articulated:

> [I]t is now generally recognized that the aged, apart from considerations of financial distress alone, are also, as a class, highly susceptible to other forms of distress in the sense they have special needs because of their advanced years. For example, it is recognized in the Congressional declaration of objectives, Older Americans Act of 1965, ... that such needs include suitable housing, physical and mental health care, civic, cultural, and recreational activities, and an overall environment conducive to dignity and independence, all specially designed to meet the needs of the aged. Satisfaction of these special needs contributes to the prevention and elimination of the causes of the unique forms of "distress" to which the aged, as 'a class, are highly susceptible and may in the proper context constitute charitable purposes or functions even though direct financial assistance in the sense of relief of poverty may not be involved.

I.R.S. Rev. Ruling 72–124, 1972–1 I.R.B. 145.

That revenue ruling pertains solely to how the Internal Revenue Service treats organizations for purposes of identifying 501(c)(3) corporations with their consequent entitlement to exemption from federal income tax. It has no bearing whatsoever on how this state assesses its property taxes. We observed in Wellsburg that "[p]roperty taxes are fundamentally different from other types of taxes, and the question of whether property is used for charitable purposes is fundamentally different from the question of whether the property-owning entity qualifies as a charitable organization for purposes of income taxes. ..." 202 W.Va. at 288–89, 503 S.E.2d at 856–57; *accord Southminster, Inc. v. Justus,* 119 N.C.App. 669, 459 S.E.2d 793, 797 (1995) (stating that North Carolina "Supreme Court has recognized that the rules for determining whether property is exempt from *ad valorem* taxes are distinct from those determining whether a corporation is

exempt from the taxes imposed by the Revenue Act"); *but see In Re Applications of Kansas Christian Home,* 268 Kan. 859, 2 P.3d 168, 173 (2000) (recognizing that under Kansas law exemption from federal income taxation entitles 501(c)(3) corporations to be similarly exempt from state property taxation). Given the indisputable distinctions between income and property taxation recognized by this state, we do not find this interpretation of federal income tax law to be controlling on the issue of ad valorem property taxation that is before us.

Even if we were to adopt the view advanced by Appellants, essentially that the provision of residential and health care to the elderly in a setting that offers them independence, dignity, and security fulfills a charitable purpose, there is still one critical component of the tax exemption test that Appellants cannot meet. To be entitled to exemption from ad valorem property taxation, Appellants cannot "limit the class of beneficiaries in such a way as to violate the definition of a charity." W.Va. R. *Taxation* § 110–3–19.3. In defining the term "charity," the Legislature has required that qualifying acts of benevolence must be "applied consistently with the existing laws, for the benefit of an indefinite number of persons." *Id.* at § 110–3–2.10. By restricting residency to only those prospective residents who can demonstrate sufficient financial means to meet their stated costs on an indefinite basis, Appellants are clearly narrowing the pool of this state's citizenry who can potentially benefit from their services. As such, the services provided by Appellants, despite their valuableness, do not benefit a sufficiently large or indefinite number of individuals so that those services "directly benefit society," which is yet another component of utilizing property for charitable purposes. *Id.* at § 110–3–19.1. In denying exemption from property taxation to a non-profit corporation operating a continuing care retirement community that imposed stringent health and financial requirements,[31] the court in *Western Massachusetts Lifecare* reasoned:

---

**31.** The entrance fees charged ranged from $100,000 to $300,000 and monthly fees ranged from $1,325 to $3,500 for the most intensive care

requirements, such as those provided to the memory impaired residents.

Reeds Landing [retirement community] is not, in light of its entrance requirements, available to a sufficiently large segment of the population to qualify as a charity under our case law. Rather, it provides a very valuable service to persons whose income and assets are sufficient to show, at the time of entry, that they will in all likelihood be able to afford a "luxury" residence for the remaining years of their lives. This form of addressing the needs of the elderly, however much it may benefit those fortunate enough to qualify for it, is indeed "remote" from our traditional concept of charity.

747 N.E.2d at 105; *see also* Rev. Ruling 79–18, 1979–1 C.B. 194 (addressing whether nonprofit organization was operated "exclusively for charitable purposes" and applying earlier revenue ruling 72–124, Internal Revenue Service required housing for elderly to be "within the financial reach of a significant segment of the community's elderly persons" to qualify for exemption of federal income tax).

█ The fact that charitable organizations, like those operated by Appellants, admittedly serve "socially constructive purposes" is, in and of itself, insufficient to qualify those organizations for an exemption from property taxation:

Institutions like that of the plaintiff [home for the aged] are in the highest American tradition. They serve to mitigate realistically some of the rougher aspects of retirement that are not altogether financial. Our affinity for the elderly makes us especially aware of these problems. We are also mindful that exemption of plaintiff's property could financially benefit to a degree the residents of its fine establishment, and we are deeply sympathetic. On the other hand, as stated, the record convinces us that the plaintiff is substantially recompensed its expenditures by these very residents who are not shown to be charity cases in the sense necessary to sustain the plaintiff's suit.

*Haines,* 173 So.2d at 185. Notwithstanding the laudable social objectives served by the existence and operation of Appellants' facilities, those purposes cannot be viewed as charitable unless they come within the definitions and conditions imposed by law for application of the tax exemption at issue. *See Appalachian Power Co. v. State Tax Dep't,* 195 W.Va. 573, 585, 466 S.E.2d 424, 436 (1995) (recognizing that legislatively approved regulations have force and controlling weight of law). As we recognized in syllabus point two of *In re Hillcrest Memorial Gardens, Inc.,* 146 W.Va. 337, 119 S.E.2d 753 (1961):

Constitutional and statutory provisions exempting property from taxation are strictly construed. It is encumbent upon a person who claims his property is exempt from taxation to show that such property clearly falls within the terms of the exemption; and if any doubt arises as to the exemption, that doubt must be resolved against the one claiming it.

While our decision is based solely on the statute and existing regulations in force, we note the argument advanced by the Tax Commissioner that if the requested exemption was granted to Appellants the effect would be to require other citizens to subsidize the lost revenues. As the court in *Mayflower Homes, Inc. v. Wapello County Board of Review,* 472 N.W.2d 632 (Iowa App.1991) observed:

We are in doubt as to the tax exempt status of Myers [senior residential facility]. It appears to be maintained to provide low-cost elderly housing to those who can generally afford such accommodations. Doubts are resolved in favor of taxation.

Mayflower and its subsidiary Myers are free to provide low-cost housing to the elderly, but it is not free to offer such low-cost housing at the taxpayers' expense when the residents can afford such housing.

Taxes lost to the public by reason of an exemption must be exacted from all other taxpayers. Hence the law requires that the institution be run for those who have a real need for it. If it is operated only for those who can well afford to pay their taxes it is not right to pass that burden along to others.

*Id.* at 634–45 (citation omitted and quoting *Atrium Village v. Board of Review,* 417 N.W.2d 70, 73 (Iowa 1987)).

Upon full consideration of the statutory and regulatory requirements which govern exemption from property taxes based on charitable use of property, we cannot conclude that the circuit courts erred in determining that Appellants were not entitled to the exemption. Rather than operating their subject senior communities to benefit society generally, as required by the definition of charity,[32] Appellants "provide[ ] facilities and services at cost only to those who are able to pay for them indefinitely." *Cape Retirement Community,* 798 S.W.2d at 204. By limiting the potential class of senior citizens who could benefit from their residential services through financial screening requirements, Appellants do not operate their respective facilities "exclusively" for charitable purposes. *See Wyndemere Retirement Community v. Department of Revenue,* 274 Ill. App.3d 455, 211 Ill.Dec. 146, 654 N.E.2d 608, 612 (1995) (finding that "the primary purpose of Wyndemere is not to provide charity, but to provide a certain enhanced lifestyle to the elderly who can afford to pay for it"). Having failed to meet the exclusive use test established in *Wellsburg,* Appellants are not entitled to the exemption from ad valorem property taxes set forth in West Virginia Code § 11-3-9. *See* 202 W.Va. at 284, 503 S.E.2d at 852, syl. pt. 3, in part. Accordingly, the decisions of the circuit courts on the issue of whether Appellants are entitled to be exempted from property taxation based on the use of their property for charitable purposes are affirmed.

### B. Taxability of Mon Elder's Leasehold Interest

■ Mon Elder argues that the lower court failed to rule on the contention it raised below that its leasehold interest in the Village has no assessable value separate from the underlying value of the property. According to Mon Elder, only when the record affirmatively establishes that the lease has acquired marketable value separate from the underlying property can such a leasehold be subject to taxation. In *Great A & P Tea Co. v. Davis,* 167 W.Va. 53, 278 S.E.2d 352 (1981), this Court recognized that "[i]t would appear from the statutory scheme [chapter eleven, articles three, five] that a separate leasehold is taxable if it has a separate and independent value from the freehold." 167 W.Va. at 55, 278 S.E.2d at 355. In syllabus point two of *Davis* this Court held:

> The county assessor may presume that leaseholds have no value independent of the freehold estate and proceed to tax all real property to the freeholder at its true and actual value; the burden of showing that a leasehold has an independent value is upon the freehold taxpayer and the taxpayer must request in a timely manner the separate listing of freehold and leasehold interests.

*Id.* at 53, 278 S.E.2d at 354.

Subsequent to the *Davis* case, the state tax department developed an eight-step process for valuing leasehold interests in real estate that is referred to as the "Leasehold Appraisal Policy." Pursuant to that process, steps one and two require an initial determination of whether a leasehold estate was created and secondly whether the lessee has a marketable right to assign or transfer the lease. The remaining six steps in the process are directed at arriving at a value for the leasehold estate. Critical to applying this policy, however, is appreciation of the fact that "the separate value of a leasehold, if any, is based on whether the leasehold is economically advantageous to the lessee, that is a so-called bargain lease, and is freely assignable so that the lessee may realize the benefit of such bargain in the market place."[33]

Mon Elder states that it put on evidence below before the Board of Review to demonstrate that its leasehold interest has no independent value[34] based on the fact that it is

---

**32.** *See* W.Va. R. *Taxation* § 110-3-2.10.

**33.** "Valuation of Leasehold Interests," State Tax Commissioner's Annual In–Service Training Seminar for Assessors, June 14, 1989.

**34.** Through the testimony of Larry McDaniel, a certified appraiser, Mon Elder introduced evidence during proceedings before the Board of Review that its leasehold interest in the Village

not a bargain lease and because it is not freely assignable. As further evidence of its inability to create a marketable asset of value from its leasehold interest, Mon Elder cites to the fact that at the end of the lease term ownership of the Village remains with the Building Commission.[35] The Tax Commissioner notes that during the final fourteen years of the forty-five-year lease, the annual rent payment by Mon Elder to the Building Commission is only $10. This fact alone, according to the Tax Commissioner, is evidence of the bargain nature of the lease agreement. In response to Mon Elder's contention that the lease at issue is not freely assignable, the Tax Commissioner states that rather than prohibiting assignment, the lease agreement only prohibits the sale of the lease without the approval of the Building Commission.

■ Because the lower court did not address this issue of whether the lease has separately assessable value, we have no factual determinations upon which to base any review of this issue. Absent these necessary factual rulings, we cannot perform any meaningful appellate review of this issue. *See Rowe v. Grapevine Corp.*, 206 W.Va. 703, 719, 527 S.E.2d 814, 830 (1999) (observing that "[s]ince the lower court dismissed this claim of Plaintiffs summarily without any findings whatsoever, we are without a predicate basis for conducting a meaningful review of the ruling on this issue"); *see also* Syl. Pt. 3, in part, *Fayette County Nat'l Bank v. Lilly*, 199 W.Va. 349, 484 S.E.2d 232 (1997) (holding that "a circuit court's order granting summary judgment must set out factual findings sufficient to permit meaningful appellate review"). Accordingly, we remand this issue of

whether the lease agreement between Mon Elder and the Building Commission has value independent of the property at issue to the circuit court for further proceedings.

## C. 2001 Assessment

■ Another assignment of error that the lower court failed to address was whether the Monongalia County Assessor had authority to assess ad valorem property taxes against Mon Elder's leasehold interest for the tax year 2001 concurrent with its assessment of taxes in 2002. Mon Elder argues that under West Virginia Code § 11-3-5 (1961) (Repl.Vol.2003), the Assessor only has authority to correct within a five-year period *omissions* from the land book.[36] Mon Elder contends that the subject property was not omitted in 2001; instead, it was assessed to the wrong party—the Building Commission. Accordingly, Mon Elder maintains that there was no authority under this statute, which pertains solely to omissions, to make a back assessment against its leasehold interest for 2001 along with the 2002 assessment issued by the Assessor.

As with the previous issue, because we are without any ruling from the circuit court that addresses this assignment of error that was properly raised below, we are similarly prohibited from conducting meaningful appellate review. Obviously, if the lower court determines upon remand that the leasehold interest held by Mon Elder does not have any independent value separate from the underlying property, this issue may be mooted. If, however, a contrary finding is reached then the trial court will have to proceed to determine the validity of the 2001 back assessment

had no value independent of the property upon which the retirement community is located.

**35.** The fact that the ownership of the buildings making up the Village remains with the Building Commission at the end of the lease term sets this lease agreement apart from the more typical lease financing arrangement, which commonly provides for the purchase by the lessee of the property at a nominal price at the end of the lease term. Mon Elder notes additionally that since the state tax department adopted the leasehold appraisal policy, the department and the board of public works have determined that leases of real property entered into as part of trans-

actions financing local economic development or infrastructure projects with industrial revenue and other types of government bonds do not create taxable leasehold estates.

**36.** That statute provides, in pertinent part, that

When the assessor shall ascertain that any real or personal property in his county liable to taxation, other than that mentioned in the next succeeding paragraph, has been omitted from the land or personal property books for a period of less than five years, he shall make an entry thereof in the proper book of the year in which such omission was discovered....

W.Va.Code § 11-3-5.

**288**

for Mon Elder's leasehold interest. Finding effective appellate review impossible to conduct absent a ruling on this issue, we remand this matter to the lower court for the purpose of specifically addressing whether the Monongalia County Assessor lacked the authority to issue the 2001 back assessment against Mon Elder for its leasehold interest.

Based on the foregoing, the decisions of the Circuit Courts of Harrison County and Monongalia County denying exemption from ad valorem property taxation to Maplewood and Mon Elder are hereby affirmed. Given the lack of rulings made by the Circuit Court of Monongalia County on the issues of whether Mon Elder's leasehold interest has independent value separate from the underlying property and whether the 2001 back tax assessment was valid, we remand those two issues to the lower court for further proceedings consistent with this opinion.

Affirmed; Affirmed, in part; Remanded, in part.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

STARCHER, Justice, concurring:

(Filed Dec. 23, 2004)

I concur in the majority's reasoning and holding.

I write separately to point out that the estate in land that is created in the living units in the instant case is a hybrid. This estate in land is unlike traditional fee ownership, and also unlike a traditional leasehold or rental estate.

Because these living units do not fit well into traditional categories of estates in land, it is difficult to apply traditional analyses to their tax status—*i.e.*, are they to be taxed as "rental" or "owner-occupied"? (To my thinking, they are more like owner-occupied.)

The Legislature probably should speak to this issue, for the guidance of taxing authorities, investors, residents, and developers.

Accordingly, I concur.